**PUBLIC SERVICE ENTERPRISE GROUP, INCORPORATED, and Public Service Electric and Gas Company, Plaintiffs,**

v.

**PHILADELPHIA ELECTRIC COMPANY, Defendant.**

**ATLANTIC CITY ELECTRIC COMPANY, and Delmarva Power & Light Company, Plaintiffs,**

v.

**PHILADELPHIA ELECTRIC COMPANY, Defendant.**

**Civ. A. Nos. 88–3214, 88–3286.**

United States District Court, D. New Jersey.

Aug. 24, 1989.

---

John B. LaVecchia, Kevin R. Gardner, Connell, Foley & Geiser, Roseland, N.J., J.A. Bouknight, Jr., Douglas G. Green, Michael F. Healy, Newman & Holtzinger, P.C., Washington, D.C., for plaintiffs Public Service Enterprise Group, Inc. and Public Service Elec. and Gas Co.

Richard C. Warmer, John H. Beisner, Saone B. Crocker, Stuart L. Fullerton, O'Melveny & Myers, Washington, D.C., Warren W. Faulk, John J. Mulderig, Brown & Connery, Westmont, N.J., for defendant Philadelphia Elec. Co.

George G. O'Brien, Bruce W. Clark, Dechert, Price & Rhoads, Princeton, N.J., Richard C. Rizzo, Fred T. Magaziner, Lawrence J. Goode, James P. Weygandt, Dechert, Price & Rhoads, Philadelphia, Pa., for plaintiffs Atlantic City Elec. Co. and Delmarva Power & Light Co.

GERRY, Chief Judge.

## I. INTRODUCTION

This case involves a clash among powerful business interests. The four corporate parties have had a lengthy history of cooperation, but have now directed their energy to litigating claims against one another.

This litigation was fueled by the Nuclear Regulatory Commission's ("NRC") suspension of power operations at the Peach Bottom Atomic Power Station ("Plant" or "Station") in Delta, Pennsylvania. These operations were suspended on March 31, 1987 after the NRC was informed that operators at the plant were sleeping on duty; the NRC did not authorize their resumption until April 17, 1989, some time after oral arguments on this motion were heard.

This power outage darkened the demeanor of the plant's co-owners: Philadelphia Electric Company ("PECO"); Public Service Electric and Gas Company and its wholly-owned subsidiary Public Service Enterprise Group, Incorporated (collectively "PSE & G"); Atlantic City Electric Company ("Atlantic City"); and DelMarVa Power & Light Company ("Delmarva").

The Peach Bottom Nuclear Plant was built and continues to operate pursuant to an agreement among these four companies. The plant commenced commercial operations in 1974, and consists of two 1,065 megawatt nuclear reactors. The companies' respective ownership shares are, as established by the Owners Agreement entered into on November 21, 1971, as follows: PSE & G (42.49%), PECO (42.49%), Atlantic City (7.51%), and Delmarva Power (7.51%). Agreement at Article 2.1 (Appended to PSE & G's Complaint as Exhibit C).

The shutdown of the plant ignited the lawsuits *sub judice.* Under the agreements among the owners, PECO pledges to "operate and maintain the station" for the owners as if it were owned solely by PECO. Agreement Art. 12, § 12.1. In performing this role PECO is to "act as an independent contractor responsible for the result to be obtained, i.e., generation of power and energy at the Station, as economically and reliably as is practica-

ble...." *Id.* PECO is the licensed operator for the Peach Bottom plant, and therefore subject to all applicable statutes and regulations, especially those administered by the NRC. PECO's Answer to PSE & G's Complaint at ¶¶ 13, 14, and 15.

On July 27, 1988, PSE & G filed a lawsuit alleging, *inter alia,* that PECO's conduct of the operations at Peach Bottom was in breach of the Owners Agreement and was also tortious. That same day a similar complaint was filed by Atlantic City Electric and Delmarva Power. The cases have been consolidated for most pre-trial purposes.

Jurisdiction over both complaints is founded on diversity of citizenship. 28 U.S.C. § 1332. Plaintiff Delmarva is a Delaware and Virginia corporation having its principal place of business in Wilmington, Delaware. Plaintiff Atlantic City Electric is a New Jersey corporation with its principal place of business in Pleasantville, New Jersey. Plaintiff PSE & G collectively consists of two New Jersey corporations having their principal places of business in Newark, New Jersey. Defendant PECO is a Pennsylvania corporation having its principal place of business in Philadelphia, Pennsylvania. Venue is proper because PECO is doing business and is licensed to do business in this district. 28 U.S.C. § 1391(c).

The essence of both complaints is as follows: (1) that the Owners' Agreement required PECO to efficiently maintain and operate the plant; (2) that PECO failed to do so and therefore the plant was shut down by the NRC for a lengthy period of time and suffered physical damage; (3) that PECO was aware of various problems at Peach Bottom, or should have been, and did not, as it was required to do, apprise the co-owners of the problems and, in fact, affirmatively misrepresented the status of the plant; and (4) as a result of PECO's actions the co-owners not only lost the power output they usually derive from Peach Bottom but incurred additional and substantial maintenance and repair costs, and fines from regulating authorities.

The plaintiffs seek redress in tort and contract. The Atlantic City/Delmarva complaint consists of two counts: count one, a breach of contract count, and count two, a tort count which includes allegations of negligence, gross negligence, wilful and wanton misconduct, fraudulent misrepresentation and negligent misrepresentation. PSE & G's complaint contains five self-styled "claims for relief": breach of contract, tort, failure to disclose, fraudulent misrepresentation and negligent misrepresentation. Compensatory damages and interest thereon are sought with respect to each of these tort claims, punitive damages are sought on the gross negligence, wilful and wanton misconduct, and fraud claims. PECO now moves to dismiss the tort claims contained in the plaintiffs' complaints.

## II. MOTION TO DISMISS

PECO's argument on this motion to dismiss is that tort remedies do not exist under the applicable law, either that of Pennsylvania or New Jersey, when misfeasance in the performance of a contract is the basis for plaintiffs' claims and the only damages suffered are economic in nature. PECO contends that the plaintiffs' complaints fail to allege facts upon which a claim for relief in tort may be granted. Fed.R.Civ.P. 12(b)(6).

In ruling upon PECO's motion "we follow, of course, the accepted rule that a complaint should not be dismissed unless it appears beyond doubt that plaintiffs can prove no set of facts in support of [their] claims which would entitle [them] to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). The question before us becomes whether, after viewing the facts pleaded in the complaints in the light most favorable to the plaintiffs and resolving every doubt in their favor, their complaints state any valid claim for relief in tort. 5 C. Wright & A. Miller, *Federal Practice and Procedure:* § 1357, at 601 (1969). To the extent parties have presented factual evidence to support or oppose this motion to dismiss, we have excluded it from consideration and will not rely upon it, with the exception of the owners' agreement which was append-

ed as an exhibit to the complaints. In any case, the exhibits submitted have primarily consisted of pleadings or opinions filed or produced for other cases the parties believe are analogous to this one.

## III. FACTUAL ALLEGATIONS

### A. The Agreement

The agreement essentially apportions the benefits and burdens of building and operating the plan in accordance with the ownership shares. That is, expenses, such as operations and maintenance costs, are allocated on the basis of ownership shares, as is the "hourly energy generation"; i.e., the power produced. Atlantic City/Delmarva Complaint ¶¶ 9, 15 ("ACE/DPL Complaint"), Agreement Art. 3, Art. 4. The agreement among the power companies leaves primary responsibility for the operation of Peach Bottom to PECO. However, Article 16 of the agreement establishes an owners' committee comprised of one representative from each company, the responsibilities of which include "coordinating the administration of all matters pertaining to the ... operation and maintenance of Peach Bottom...." Agreement Art. 16. The owners also established an "Operations and Maintenance Committee" ("O & M") to "review general performance and operations at Peach Bottom as well as proposed capital expenditures and expense budgets and to make recommendations on these matters to the Owners' Committee." PSE & G Complaint ¶ 11. These committees meet on a quarterly basis by telephone conference. *Id.*

PECO provides them with a daily status report on the plant's operations. *Id.;* Agreement Art. 13, § 13.1 (PECO "shall keep ACE, DPL and PS fully informed of the status of the Station. Operations shall be scheduled so as to result in the maximum practicable benefit to the signatories from the utilization of the Station output.") In addition, PECO is required to assign "sufficient trained personnel to operate the Station in a reliable and economical man-

ner, such personnel to be employees solely of PE[CO]." Agreement Art. 12, § 12.1.

Moreover, under the agreement PECO is the NRC licensed operator of Peach Bottom and, as such, is responsible for the safe operation of the plant. ACE/DPL Complaint ¶ 16. As the licensed operator, PECO has a duty to the public and its co-owners to comply ·with the laws and regulations covering nuclear power facilities. ACE/DPL Complaint ¶ 17; PSE & G Complaint ¶ 13. Among its other legal duties PECO must comply with 10 C.F.R. §§ 55.54(k) by having a licensed or senior operator "present at the controls at all times during the operation of the facility." ACE/DPL Complaint ¶ 18; PSE & G Complaint ¶ 14, and with NRC Regulatory Guide 1.114 which provides:

> In order for the operator at the controls of a nuclear power plant to be able to carry out these and other responsibilities in a timely fashion, he must give his attention to the condition of the plant at all times. He must be alert in order to ensure that the plant is operating safely and must be capable of taking action to prevent any progress toward a condition that might be unsafe.

ACE/DPL Complaint ¶ 19; PSE & G Complaint ¶ 15.

PECO is also subject to several other regulations concerning the training of plant personnel and staffing at the plant. ACE/DPL Complaint ¶ 18; PSE & G Complaint ¶ 14. And pursuant to 10 C.F.R. § 50, Appendix B, PECO is responsible for establishing and maintaining a quality assurance program to ensure that the plant is run safely. ACE/DPL Complaint ¶ 20.

### B. PECO's Alleged Failures

PECO's mismanagement of the Peach Bottom plant allegedly began as early as 1985. During that year, PECO received warnings from the NRC and the Institute of Nuclear Power Operations ("INPO")[1] that Peach Bottom's performance was not up to industry standards. PSE & G Com-

---

**1.** INPO is "an expert nuclear oversight organization created by the industry to review its per-

formance." PSE & G Complaint ¶ 6.

plant ¶ 16. These criticisms were not communicated to PSE & G. Nor were the most serious of these warnings conveyed to Atlantic City Electric and Delmarva Power. ACE/DPL Complaint ¶¶ 23, 24. Instead, PECO told PSE & G that it had made significant improvements in conditions at Peach Bottom.

In January of 1986, for example, INPO sent a letter to PECO's Chairman and CEO stating that "[s]tandards of performance at ... [Peach Bottom] are unacceptably low," and rated Peach Bottom's overall performance "in the MARGINAL category of plant performance." ACE/DPL Complaint ¶ 24 (emphasis in original.) This letter and other INPO warnings were not disclosed to the other owners. *Id.*

The crucial failure of PECO, however, supposedly lies in its failure to act on warnings by six General Electric Senior Reactor Operators ("GE SRO's") that PECO control room personnel were routinely sleeping on the job or otherwise being inattentive to their duties. These GE SRO's were working under contract with PECO to help in improving the plant's performance in response to INPO and NRC criticism. PSE & G Complaint ¶¶ 17, 18.

PECO did not report these incidents of sleeping on the job to the NRC or its co-owners. *Id.* Instead, PECO made presentations to the Owners' Committee in November and December 1986 indicating that there were no major problems at the plant and that all the concerns raised by the NRC and INPO were being addressed. These presentations involved an improvement program designed to rectify problems at the plant. However, the program "did not identify gross operator inattentiveness as a problem despite the reports of this behavior." *Id.* ¶ 19.

Reports of inattentive behavior continued to be made to PECO in the period from December 1986 to February 1987. Despite this, PECO submitted a status report to the co-owners stating that there were no major problems at the plant. *Id.* at ¶ 20.

On March 24, 1987, the NRC was informed, presumably by the GE SRO's, that Peach Bottom control room operators were sleeping on duty. The NRC initiated a 24 hour-a-day inspection coverage at the plant's control room. On March 31, 1987, the NRC issued a shut-down order, which stated in part:

(1) At times during various shifts, in particular the 11:00 p.m. to 7:00 a.m. shift, one or more of the Peach Bottom operations control room staff (including licensed operators, senior licensed operators and shift supervision) have for at least the past five months periodically slept or have been otherwise inattentive to licensed duties.

(2) Management at the Shift Supervisor and Shift Superintendent level have either known and condoned the facts set forth in Paragraph one, or should have known of these facts.

(3) Plant management above the shift superintendent position either knew or should have known the facts set forth in Paragraph one and either took no action or inadequate action to correct this situation.

*Id.* ¶ 23 (Shut-down Order Appended as Exhibit A to PSE & G's Complaint); ACE/DPL Complaint ¶ 35. Based on these findings, the NRC found that there was not a reasonable assurance that the plant was being operated "in a manner to assure that the health and safety of the public [would] be protected" and ordered that power operations at the plant cease. Shutdown Order at 5, ACE/DPL Complaint ¶ 38.

In the period following shut-down, PECO is alleged to have been uncooperative with INPO and NRC in responding to their suggestions about the need for management restructuring at PECO's nuclear operations division, and ineffective in redressing the problems leading to the shutdown. ACE/DPL Complaint ¶¶ 39–44; PSE & G Complaint ¶¶ 28–43. Aside from its delays in making the changes necessary to get Peach Bottom reauthorized for power operations, PECO is alleged to have continued to misrepresent the condition of the plant's operations and the status of the restart effort. *Id.*

On February 2, 1988, heads rolled at PECO. Its president, John Austin, re-

signed, followed shortly by its CEO Lee Everett. On March 31, 1988, PECO's new management issued a letter admitting that the March 31, 1987 shutdown order was an "appropriate action on the part of the NRC for the protection of the public's health and safety." PSE & G Complaint ¶ 44. At the time of oral argument on this motion, the new management had not yet gained reauthorization for the restart of power operations. Restart of nuclear operations at Peach Bottom was authorized by the NRC on April 17, 1989. The plant began operating at full power on August 4, 1989.

At oral argument there was some question as to whether either of the complaints contained allegations that physical damage to the plant resulted from PECO's failure to maintain the plant. Published newspaper reports indicate that earlier this year one-third of the surface area of the plant was contaminated with radiation, which had leaked from pipes PECO failed to maintain. Atlantic City Electric and Delmarva Power amended their complaint at our request, to add specific allegations of physical damage. PSE & G did not choose to do so, believing that its complaint, if broadly read, already encompassed such a claim. In any case, we will read both complaints as alleging such property damage.

### C. Damages

The plaintiffs allege that the shutdown of the plant and the physical deterioration of the plant which resulted from PECO's failures has caused them hundreds of millions of dollars in damages. These consist of: (1) the cost of replacing power usually generated by the plant; (2) lost profits; (3) increased operations and maintenance costs; (4) expenditures to clean up and repair portions of the plant not adequately maintained by PECO; and (5) additional capital expenditures and other costs associated with the shutdown. Estimates of the cost of the shutdown to PECO and its co-owners have been placed in the $735 million range; $235 million of which PECO has described as "the tremendous cost of the fix", that is, the cost of maintenance, repairs and new operational procedures. ACE/DPL Complaint ¶ 48.

### IV. LEGAL ANALYSIS

Thanks to the diligent and capable efforts of counsel, our analysis is informed by numerous opinions written by the courts of this Circuit and the States of New Jersey and Pennsylvania, among others.

There can be no reconciliation of all that we have seen on our journey to the region of the tort-contract border. We cannot explain or make consistent the decisions of all these courts; no one can. What we must do is isolate the fundamental, basic principles which underlie those decisions and attempt to apply them to the dispute before us. This is no easy task, as root principles have not been universally agreed upon, and, because of shifting policy concerns, slight contextual differences can result in drastically different exposure to tort liability. But we have done our best, mindful that any uncertainty counsels against granting PECO's motion. With these initial thoughts in mind, we turn to the issues before us.

### A. Choice of Law

As our jurisdiction is based on diversity of citizenship, it is state law which must provide the substantive law to govern this dispute. But which state's law?

The contestants in the Atlantic City/Delmarva–PECO bout both believe their fight should be determined by Pennsylvania law. However, PSE & G argues that New Jersey should supply the substantive law governing its action. PECO argues that we need not engage in a premature choice-of-law analysis, since it is entitled to dismissal of all the plaintiffs' tort claims under either Pennsylvania or New Jersey law. Atlantic City/Delmarva insist that dismissal would be improper under either of these states' laws. PSE & G urges us to apply New Jersey law to its claim and deny PECO's motion.

To make a choice of law in a diversity case, a federal court must apply the conflicts of law principles of its forum state. *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 496–97, 61 S.Ct.

1020, 1021–22, 85 L.Ed. 1477 (1941). Therefore, if we are to make a choice, we must look to New Jersey's conflicts doctrine. New Jersey applies a governmental interest approach to conflicts questions, which requires:

> a two-step analysis. The court determines first the governmental policies evidenced by the laws of each related jurisdiction and second the factual contacts between the parties and each related jurisdiction. A state is deemed interested only where application of its laws to the facts in issue will foster that state's policy.

*Henry v. Richardson–Merrell, Inc.*, 508 F.2d 28, 32 (3d Cir.1975). This second step requires a qualitative rather than a quantitative weighing in which "only contacts which are likely to promote valued state policies are considered relevant." *Id.*

PSE & G has made a spirited argument that New Jersey would apply its own law to PSE & G's dispute with PECO. It points out that two of the parties to these two complaints are from New Jersey, one is from Pennsylvania, and the other from Delaware and Virginia. Thus, PSE & G says, "the factor of the parties' citizenship is for all practical purposes neutralized inasmuch as the ... interests which are identified effectively cancel each other out...." *Blakesley v. Wolford*, 789 F.2d 236, 241 (3d Cir.1986). Moreover, the fact that Peach Bottom is in Pennsylvania is, in itself, deceiving since these same parties are co-owners of the Salem nuclear facility in Salem, New Jersey.

Further, while PECO's alleged misconduct took place in Pennsylvania, its misrepresentations were transmitted into New Jersey. Most importantly, the injuries suffered by PSE & G because of PECO's failures occurred in New Jersey and "New Jersey cases have almost uniformly applied New Jersey law in instances in which the state had a significant compensation interest, *viz.*, where the plaintiff was a New Jersey domiciliary." *Schum v. Bailey*, 578 F.2d 493, 496 (3d Cir.1978). This policy interest, along with New Jersey's interest in deterring tortious behavior by persons whose behavior affects New Jersey residents, is overriding and would lead New Jersey courts to choose their own law.

PECO admits that the parties' citizenship is a neutral factor but insists that the relevant relationship between the parties is centered firmly in Pennsylvania. Pennsylvania is the site of Peach Bottom, and PSE & G voluntarily contracted with PECO, a Pennsylvania corporation, to build and operate the plant there. The joint efforts with respect to the plant were pursued under the Peach Bottom Owners Agreement, which contains a clause indicating it "shall be construed, interpreted and controlled by the laws of the Commonwealth of Pennsylvania." Agreement ¶ 26.1.

Not only did the conduct which PSE & G complains of take place in Pennsylvania, but so did, PECO claims, *the injury to PSE & G's ownership interest in the Pennsylvania plant.* More significantly, Pennsylvania's governmental interest is superior to New Jersey's because this case involves a complaint against a Pennsylvania public utility brought by a plaintiff which "expressly availed itself of Pennsylvania law in making the contract." PECO Reply Brief at 32. In such a circumstance, New Jersey will defer to Pennsylvania's "interest in effectuating its policy of disallowing recovery in tort for economic loss stemming from commercial disputes with its resident corporations." *Id.* at 33.

Luckily for the court, PECO has agreed to bear its burden on this motion by fighting under both New Jersey and Pennsylvania law. For if under both sets of law PECO is entitled to dismissal of the plaintiffs' tort claims, we need not make a choice of law. *Rohm & Haas Co. v. Adco Chemical Co.*, 689 F.2d 424, 429 (3d Cir. 1982) ("When ... a 'false conflict' exists, New Jersey conflicts of law rules permit the resolution of the case without a choice between the laws of the two states.")

Given this posture, we decline PSE & G's invitation to engage in a choice of law analysis at this time. The parties have devoted very little of their attention to the oft-times complicated factual and legal considerations relevant to such an analysis. If

we must, we will at an appropriate time, address these issues.[2] For now we will consider the sufficiently complex question of whether plaintiffs' complaints state a claim for tort relief under Pennsylvania or New Jersey law. Though the parties have discussed the two states' laws concurrently, we will try, for the sake of clarity, to discuss them separately.

Our task is complicated by the fact that neither the Pennsylvania nor the New Jersey Supreme Court has addressed the precise question raised by this motion. Thus, our duty is to predict how these courts would decide this motion. In engaging in this exercise in prediction "we must consider relevant state precedents, analogous decisions, considered dicta, scholarly works, and any other reliable data tending convincingly to show how the highest court in the state would decide the issue at hand." *Aloe Coal Co. v. Clark Equipment Co.*, 816 F.2d 110, 117 (3d Cir.1987), *quoting McGowan v. Univ. of Scranton*, 759 F.2d 287, 291 (3d Cir.1985); *see also, Pennsylvania Glass Sand v. Caterpillar Tractor Co.*, 652 F.2d 1165, 1167 (3d Cir.1981); *Jones & Laughlin Steel v. Johns–Manville Sales*, 626 F.2d 280, 285 (3d Cir.1980). We are admonished not to disregard a ruling of a Pennsylvania or New Jersey intermediate appellate court unless we are convinced that the decision would have been decided otherwise by the relevant State Supreme Court. *Commissioner v. Estate of Bosch*, 387 U.S. 456, 465, 87 S.Ct. 1776, 1782–83, 18 L.Ed.2d 886 (1967), *cited in Jones v. Laughlin Steel*, 626 F.2d at 285, n. 10. With this in mind, we proceed.

### B. Contending Viewpoints

This motion presents us with a choice initially between competing visions of Pennsylvania law. Setting forth these contending viewpoints as argued by the parties seems of value, so we do so. We start with the movant's argument.[3]

#### 1. *PECO's Argument*

PECO claims that the plaintiffs' tort claims are designed to obtain a better bar-

---

**2.** Our instinct is that the choice of law question is not the easy one PECO and PSE & G suggest it is. Several factors suggest otherwise. First, the important role these utilities play in the lives of citizens of both New Jersey and Pennsylvania indicates that each state may have a large interest in applying its law to this dispute.

Second, the fact that the contract has a Pennsylvania choice-of-law provision raises questions about whether New Jersey would allow the substantive law of another state to govern a contract claim but apply its own law to tort claims arising out of the same conduct.

PSE & G insists that New Jersey would do just that, citing us to *Monsanto Company v. Alden Leeds, Inc.*, 130 N.J.Super. 245, 326 A.2d 90 (Law Div.Super.1974). However, *Monsanto* is a case which illustrates the nice questions to be decided by conflicts law. *Monsanto* involved the sale of dry organic chlorine to a party in New Jersey. The U.C.C. applied, and the contract called for the application of Missouri law. The court held that "[s]ince the contract specifies the law to govern its interpretation, and public policy does not dictate otherwise, the contract will be interpreted under Missouri law." *Id.* 326 A.2d at 94. However, the tort claims were to be governed by New Jersey law since the seller shipped the chlorine into New Jersey and knew that any harm flowing from a defect would occur there.

But to determine whether such tort relief was available, the court indicated that it had to look back to Missouri law to see whether there was a valid contractual liability limitation, but in so doing the court discussed only New Jersey law. *Id.* at 98–99. Assuming that it discussed New Jersey law only because New Jersey's version of the U.C.C. was identical to Missouri's, *Monsanto* may stand for the proposition that if a limitation on tort liability would be recognized by the law of the state governing the contract, then such a clause bars tort liability even if New Jersey law would give shape to whatever tort remedies were available. Such a case, in short, hardly furthers PSE & G's cause.

Third, New Jersey's conflicts approach depends on factual contacts. While there may be little eventual dispute about where things were done or where parties are located, New Jersey's focus on qualitative contacts suggests the need for the parties to present the court with more evidence about their overall relationship. We are especially interested in how the parties' co-ownership of the Salem plant, which has also given rise to a counterclaim in this action, affects the choice-of-law analysis. Finally, the parties have not addressed the ramifications of applying Pennsylvania law to the Atlantic City/Delmarva litigation and New Jersey law to the PSE & G litigation.

**3.** In so doing, it should be noted that in the following two subsections we present disputants' views of the law. The description of the cases is our own. The arguments drawn therefrom, except for the court's asides, are those of the parties.

gain than they made when they agreed to build and operate the Peach Bottom plant. The Owners Agreement provided no profit to PECO for its role as the licensed operator of the plant; whatever benefit PECO derived from the plant was from its proportionate share of the power produced. PECO says that it undertook no obligation to insure its co-owners against economic loss caused by a power outage of the plant. Rather, the Owners Agreement was specifically amended to provide that "[a]ll power replacement costs incurred by each [co-owner] as a result of the total or partial unavailability of its ownership share of the [Peach Bottom] Station shall not be considered as a shared liability and shall be borne entirely by each [co-owner]." Agreement ¶ 25.2.

It is this bargain plaintiffs seek to evade. By pleading these tort claims, plaintiffs seek to foist hundreds of millions of dollars of damages upon PECO for breach of an obligation to its co-owners it never undertook—something which they cannot do consistent with Pennsylvania law.

### a. The Economic Loss Doctrine

PECO's motion to dismiss is based on its view of both the definition of and the appropriate application of the so-called "economic loss doctrine." This doctrine bars a plaintiff from recovering purely economic losses suffered as a result of a defendant's negligent or otherwise tortious behavior, absent proof that the defendant's conduct caused actual physical harm to a plaintiff or his property.[4] As PECO sees it, this doctrine serves not only as a check on the imposition of limitless liability on negligent actors with respect to unforeseen or unlikely plaintiffs, but also as a boundary between tort and contract liability for parties in privity. That is, when a plaintiff alleges

that a defendant's improper performance of a contract resulted in merely economic losses such as power replacement costs and lost profits, and not physical harm to property other than property which is the subject of the maintenance contract between the parties, the economic loss doctrine bars a tort recovery and leaves the plaintiff to his contractual remedies. Indeed, when only economic losses are at stake, the existence of a contract or the validity of an exculpatory clause therein are not really relevant, since such losses are simply not redressable in tort.

There is no gain-saying the fact that Pennsylvania law is hostile to the recovery of economic losses in tort, at least with respect to parties not in contractual privity. *Margolis v. Jackson*, 375 Pa.Super. 182, 543 A.2d 1238, 1240 (1988) (Pennsylvania "cases clearly limit the extent that a negligent tortfeasor will be made legally liable for an economic loss caused directly or indirectly by the tortfeasor's negligent act or conduct. Purely economic loss, when not accompanied with or occasioned by physical injury, is considered beyond the scope of recovery even if a direct result of the negligent act."); *accord Moore v. Pavex*, 356 Pa.Super. 50, 514 A.2d 137 (1986); *Aikens v. Baltimore & Ohio R. Co.*, 348 Pa.Super. 17, 501 A.2d 277, 279 (1985) ("To allow a cause of action for negligent cause of purely economic loss would be to open the door to every person in the economic chain of the negligent person or business to bring a cause of action. Such an outstanding burden is clearly inappropriate and a danger to our economic system.")

Pennsylvania courts have refused to relax this doctrine even when the plaintiff's allegations of economic loss stemmed from the serious and well-known nuclear incident

---

**4.** Definitions of economic loss abound. In the warranty context, it has been said that:

> Economic loss can take the form of either direct or consequential damages. A direct economic loss includes the loss of the benefit of the bargain, i.e., the difference between the value of the product as represented and the value in its defective condition. Consequential economic loss includes such indirect losses as lost profits.

*Spring Motors Distributors v. Ford Motors Co.*, 98 N.J. 555, 489 A.2d 660, 665 (1985). Or as the Third Circuit has said, "The items most frequently sought as damages for unsuitable products are the reduction in value caused by the defect, cost of repair or replacement, and loss of profits." *Pennsylvania Glass Sand v. Caterpillar Tractor Co.*, 652 F.2d 1165, 1169 (3d Cir.1981).

In essence, economic losses are all pecuniary damages not resulting from physical harm or property damage.

at Three Mile Island. In *Com. of Pa. v. General Public Utilities Corp.*, 710 F.2d 117 (3d Cir.1983), the Court of Appeals for the Third Circuit, *inter alia*, reviewed a summary judgment order entered against plaintiffs, who were a group of governmental entities who sought to recover damages, e.g. increased civil defense costs, they allegedly suffered as a result of the TMI incident. The district court had granted summary judgment for the defendants on the grounds that the plaintiff pled only purely economic loss and "courts have consistently refused to recognize a cause of action in negligence or strict liability for economic injury unattended by physical injury or damage to real or personal property." *In re TMI Litigation Governmental Entities Claim*, 544 F.Supp. 853, 857 (M.D. Pa.1982) *vacated and remanded, sub nom* 710 F.2d 117 (3d Cir.1983).

The Court of Appeals held that though plaintiff's complaint did not contain any claim for direct physical damage to property, such as public buildings, "there was the contention by plaintiffs that increased radioactivity ... emitted during the nuclear incident ... rendered the public building unsafe for a temporary period of time and constituted a physical intrusion upon the plaintiff's properties." 710 F.2d at 122–23. Though the court refused to speculate on whether such a showing would suffice to establish physical harm and serve as a basis for recovery, the court indicated that the "plaintiffs should be permitted to develop the facts upon which these contentions may be tested".[5] *Id.* at 123.

Just last year the Pennsylvania Superior Court considered another case arising out of Three Mile Island and confronted the question of whether there was a nuclear accident exception to the economic loss rule. The court held that there was no

such exception. *Gen. Publ. Util. v. Glass Kitchens of Lancaster, Inc.*, 374 Pa.Super. 203, 542 A.2d 567 (1988).

The plaintiffs in *Glass Kitchens* were associated with the tourist industry in Lancaster County, Pennsylvania. They sought to recover damages for economic loss allegedly suffered because of a diminution of tourists caused by the Three Mile Island nuclear incident. The case reached the Superior Court on this certified question of law:

> Where plaintiffs waive the right to seek damages their properties might have suffered from contamination after a nuclear accident, are such accidents at nuclear power plants an exception to the general tort rule that a plaintiff must sustain personal injury or property damage as a prerequisite for recovery of economic loss?

*Id.* 542 A.2d at 570.

The court answered in the negative, holding that there is no nuclear accident exception to the economic loss rule. *Id.* at 571. While Pennsylvania courts recognize that persons or property who have come into contact with radiation or nuclear fall-out "will suffer a direct and predictable actual injury," this did not relieve the plaintiffs of proving that the TMI incident "resulted in actual physical injury or property damage." *Id.* at 571. Only by making such a showing could a plaintiff recover for economic loss in tort. *Id.* Likewise, the Second Circuit, while acknowledging that nuclear power plants may in the case of an accident cause injury on a grand scale, held that if the only harm plaintiff suffered was economic then the economic loss rule operated to bar recovery in tort. *County of Suffolk v. Long Island Lighting Co.*, 728 F.2d 52, 62–63 (2d Cir.1984); *see also, Long Island*

---

5. Similarly, the court vacated the district court's dismissal of plaintiffs' claims for recovery of their increased costs incurred responding to the TMI incident. While not disagreeing with the general proposition that public expenditures made in responding to emergencies like fires are generally not recoverable in tort, the court said "there might be specific information about the nature of the risks posed by such plants or the governmental problems involved in responding to nuclear incidents that plaintiffs could present to show that the nuclear industry differs from other industries in material respects and thus that the Pennsylvania courts would treat it differently. Because this issue is at the heart of plaintiffs' case, they should have been given the opportunity to present such evidence before summary judgment was granted." *Id.* at 121.

*Lighting Co. v. Transamerica Delaval,* 646 F.Supp. 1442 (S.D.N.Y.1986).

Of course, these Pennsylvania cases all involve disputes between plaintiffs and defendants not in contractual privity. But PECO contends Pennsylvania courts are also unwilling to allow a plaintiff in privity with a defendant to recover purely economic losses in tort. The economic loss doctrine prevents recovery of tort damages where the only harm plaintiff alleges is the failure to receive the benefits of its contractual relationship with the defendant because of that defendant's acts.

b. The Wonderful World of Warranty

Supporting this view are a series of recent warranty cases, which PECO argues stand for principles fully applicable to the dispute before us.

In *East River S.S. Corp. v. Transamerica Delaval,* 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986), the Supreme Court, sitting in admiralty, held that whether stated in negligence or strict liability terms, no products liability claim exists in admiralty when a commercial party alleges injury only to the purchased product itself resulting in purely economic loss. The Court indicated that the justification for both the physical injury and other property exceptions to the economic loss rule rests on the policy of imposing responsibility for damages on the party which can most effectively reduce the safety hazards posed by defective products, that is, on the manufacturer. *Id.* at 867, 106 S.Ct. at 2300.[6]

But where there is no injury to a person or to property other than the defective product itself, "the commercial user stands to lose the value of the product, risks the displeasure of its customers who find that the product does not meet their needs, *or, as in this case, experiences increased cost*

in performing a service." *Id.* at 871, 106 S.Ct. at 2302 (emphasis added). The Court stressed that the losses that result when the purchased product injures only itself "mean simply that the product has not met the customer's expectations, or, in other words, that the customer has received insufficient product value." *Id.* at 872, 106 S.Ct. at 2302. (quotations omitted.) Commercial parties are able to allocate the risk that products will not perform as expected through a contract, and when they make such an allocation it should not be displaced by an overriding tort remedy. "[W]arranty law sufficiently protects the purchaser by allowing it to obtain the benefit of its bargain." *Id.* at 873, 106 S.Ct. at 2303.

*East River* takes on the character of more than persuasive authority here, because the Court of Appeals for the Third Circuit predicted that the Supreme Court of Pennsylvania would, if the issue was presented to them, adopt *East River* as the law of Pennsylvania. *Aloe Coal Co. v. Clark Equipment,* 816 F.2d 110 (3d Cir. 1987). It did so even while recognizing that it had only recently indicated that Pennsylvania courts would adopt the approach articulated in *Pennsylvania Glass Sand, supra,* 652 F.2d 1165, which held that the question of whether product damages are considered purely economic loss and not compensable in tort depended on the nature of the product defect, the type of risk posed by the defect, and the manner in which the injury to the product itself occurred.

The Third Circuit emphasized that the Supreme Court had rejected "intermediate" approaches like *Pennsylvania Glass* as unsatisfactory, indicating that when a product injures itself "the damage may be qualitative, occurring through gradual deterioration or internal breakage[,] it may be ca-

---

6. *See also, Jones & Laughlin Steel v. Johns-Manville Sales,* 626 F.2d 280, 288 (3d Cir.1980):

Courts have adopted strict liability for cases involving injury to persons or other property in order to place the cost of such injuries on the manufacturer—the party best able to distribute the costs. Inasmuch as the defective product may well injure persons who have not purchased the product or in any way dealt with the manufacturer, *there is no price mech-*

*anism by which to insure such persons against the risk of loss.*

Economic loss "which results from the failure of the product to perform to the level expected by the buyer and seller" is different since the risk of mere product failure, and accompanying lost profits, is one which can be allocated in bargaining over price, even by subsequent purchasers. *Id.*

lamitous ... [b]ut either way, since by definition no person or other property is damaged, the resulting loss is purely economic." *Aloe Coal*, 816 F.2d at 117, *quoting East River*, 476 U.S. at 870, 106 S.Ct. at 2302. The Circuit was impressed by the Supreme Court's careful consideration of the fundamental principles of tort and contract law, and indicated that *East River* could be read as resting on five considerations:

> (1) when the defective product injures only itself the reasons for imposing a tort duty are weak and those limiting remedies to contract law are strong; (2) damage to the product itself is most naturally understood as a warranty claim; (3) contract law is well suited to commercial controversies because the parties may set the terms of their own agreements; (4) warranty law sufficiently protects purchasers by allowing them to obtain the benefit of their bargain; and (5) warranty law has a built-in limitation on liability, whereas tort actions could subject manufacturers to an indefinite amount of damages.

*Aloe Coal*, 816 F.2d at 118.

Another important consideration was the extent to which contract, or more precisely warranty law suited the "realities of the marketplace." *Id.* In the marketplace, commercial parties may strike a bargain whereby the manufacturer restricts its liability by disclaiming warranties or limiting remedies in exchange for exacting a lower purchase price. *Id.* When such a bargain is struck, public policy, as expressed through federal common law, is best served by restricting the parties to its terms rather than disrupting it by recognizing a concurrent cause of action in tort; a cause of action in which the bargained for allocation of risks is supplanted by a potentially limitless imposition of liability upon the manufacturer. *Id.*

PECO contends that the present case, while not governed by the U.C.C., implicates the concerns expressed in the *East River* line of cases. The damages sought by the plaintiffs, increased costs because of the shutdown, lost profits, and other consequential damages, constitute purely economic loss. The plaintiffs merely seek to be placed in the position they would have enjoyed had PECO lived up to the plaintiffs' view of its contractual obligations. According to PECO, where commercial actors such as the parties to this litigation have for years run a nuclear power plant according to a complex and carefully drafted contractual allocation of risks, benefits and responsibilities, *East River's* teaching indicates that concurrent tort liability does not exist. Where economic damages are claimed which are a foreseeable result of a breach of contract, it is to contract law rather than tort to which a commercial plaintiff must look to be made whole. To hold otherwise would be to disrupt the expectations of the parties by supplanting their agreement by allowance of a tort recovery, which raises the possibility of potentially unlimited liability—especially in the form of punitive damages.

PECO supports this argument by pointing to *King v. Hilton–Davis*, 855 F.2d 1047 (3d Cir.1988), a recent decision applying Pennsylvania law. In *King*, the Third Circuit dealt with how to determine whether a product "injured only itself" and determined that the question is answered by looking at the product purchased by the plaintiff as opposed to the product sold by the defendant. The crucial factor in deciding what remedies are available to a plaintiff is the character of the plaintiff's loss:

> As we read *East River*, it is the character of the plaintiff's loss that determines the nature of the available remedies. When loss of the benefit of a bargain is the plaintiff's sole loss, the judgment of the Supreme Court was that the undesirable consequences of affording a tort remedy in addition to a contract-based recovery were sufficient to outweigh the limited interest of the plaintiff in having relief beyond that provided by warranty claims. The relevant bargain in this context is that struck by the plaintiff. It is that bargain that determines his or her economic loss and whether he or she has been injured beyond that loss. Moreover the *East River* analysis dictates that where the purchaser of a defective prod-

uct sues the manufacturer from whom he or she has purchased the product, rather than a supplier of components for the product, the relevant product is what the plaintiff bargained for and the remedy is limited to a contract-based recovery.

*Id.* at 1051. Like *King*, this case is not one so factually distinguishable to deviate from *Aloe Coal*'s prediction "that the Supreme Court of Pennsylvania would decline to follow a course that would severely restrict the ability of parties in commercial transactions to allocate the risk of purely economic losses and would leave a manufacturer with an open-ended and indefinite liability for such losses." *Id.* at 1053.

Here, plaintiffs and defendants struck a bargain. PECO was to run the plant for itself and its co-owners. The co-owners were to assume the risk that there might be power outages at the plant; PECO was to operate the plant without making a profit for rendering such services. Such a bargain is best evaluated by the principles of contract. For even if the contractual liability limitations are invalid, the harm suffered by plaintiffs is nothing more than the failure of PECO to provide plaintiffs with what they perceive to be the benefit of their contractual bargain. *East River* and its progeny thus counsel dismissal of plaintiffs' tort claims. To rule otherwise would be to disrupt the expectations of these large commercial entities and to send a message to other economic actors that they may not safely enter into arms-length business transactions, even with other large entities, without fear of subjecting themselves to unlimited tort liability.

PECO says this danger would lead the Pennsylvania Supreme Court to extend this hostility to recovery of loss by commercial parties beyond contracts for the sale of goods to a service contract, like the operation and maintenance contract among these parties. And one federal court sitting in Pennsylvania has extended the *East River* analysis to a non-warranty case. In *PPG*

*Industries, Inc. v. Sundstrand Corp.*, 681 F.Supp. 287 (W.D.Pa.1988), two kinds of contracts were really at issue: (1) a contract for the sale of collet fingers,[7] and (2) an engineering design services contract. The plaintiff and defendant had entered into an engineering services contract in which the defendant was to do analysis and testing of collet fingers plaintiff wished to purchase. After these tests were performed, plaintiff bought collets from the defendant.

Later, defendant performed a study to determine whether collet fingers not machined on the inside surface, and therefore cheaper, would still meet plaintiff's stress and fatigue life criteria. The plaintiff alleged that the defendant gave written assurance that the cheaper collet fingers would not have diminished stress and fatigue lives. Based on this assurance, plaintiff purchased the cheaper fingers from the defendant and complained that they developed stress cracks from stress below the plaintiff's specified minimum life.

The plaintiff sued, alleging a breach of the engineering services agreement. Plaintiff also attempted to recover in tort alleging that defendant had "breached its duty to perform its design work in a professional and non-negligent manner" and had misrepresented by not disclosing that it had not tested the cheaper fingers and by assuring plaintiff that the fingers would meet their criteria. Plaintiff sought damages for replacement costs and other economic loss caused by the failure of the collet fingers.

The court granted the defendant's motion for summary judgment as to the plaintiff's tort claim, relying heavily on *East River*. Though *East River* was a products case, the court felt that "its examination of the proper role of contract and tort remedies ha[d] application in this dry land dispute over an engineering agreement." *Id.* at 290. The court noted that the plaintiff sought only to recover economic loss flow-

---

**7.** The court indicated that collet systems are utilized in the manufacture of fiberglass. The collet fingers which did not perform to plaintiff's expectations were described as "aluminum extrusions." *Id.* at 287. What collet fingers do or look like is something of which we remain wholly ignorant.

ing from defendant's breach, i.e., damages suffered because it did not receive the benefit of its bargain. In such a dispute between two commercial parties *East River* appropriately applied to bar a tort recovery.

The fact that the contract involved professional services rather than the provision of manufactured goods, did not, the court held, change the appropriate analysis. While acknowledging the existence of a concurrent body of tort law dealing with professional malpractice, the court did not view the decision as imperiling malpractice law, because the "special non-contractual duties of professionals such as doctors, lawyers and architects enforced by tort law were created in part to make up for the lack of sophistication and bargaining power of those seeking these professional services." *Id.* Such conditions, the court stated, do not ordinarily obtain in service contracts between two commercial parties. As such, summary judgment on plaintiff's tort claims, including its fraud claim, was appropriate under any of the potentially applicable laws, including Pennsylvania's. *Id.; see also, Public Service Co. of N.H. v. Westinghouse Elec.*, 685 F.Supp. 1281, 1287 (D.N.H.1988);[8] *Streiff Jewelry Co. v. United Parcel Serv.*, 670 F.Supp. 341 (S.D. Fla.1987) *withdrawn per stipulation* 679 F.Supp. 7 (S.D.Fla.1988) (No tort remedy available for a plaintiff alleging economic loss arising out of a breach of a shipping contract.)

### c. The Plaintiffs' Allegations Do Not Fall Within Any Exception to the Economic Loss Rule

PECO asserts that the plaintiffs may not avoid the effect of the economic loss doctrine simply because they are in contractual privity with PECO. Unlike plaintiffs not in contractual privity with a defendant, however, the plaintiffs here may recover

for economic loss against PECO but only in contract. The plaintiffs have tried to evade this clear rule by pleading fraud and wanton and wilful misconduct, all in an attempt to do better than their contractual bargain—and in the hope that they can recover large punitive damage awards.

PECO claims there are only two discrete exceptions to the economic loss rule: (1) when a defendant's conduct causes physical injury to property or persons or (2) when the defendant's breach is of a duty imposed by law, rather than by contract. Neither situation is applicable here.

The fact that this case involves a service contract is irrelevant. Unlike service cases involving certain professionals upon which the law has imposed certain duties, no cases have been cited which stand for the proposition that a commercial party such as PECO owed some legally imposed duty, outside the contract, to avoid causing economic loss to its corporate confrere's. Therefore, a tort recovery is inappropriate and unavailable. *PPG Industries*, 681 F.Supp. at 290.

Nor can the economic loss doctrine be by-passed by allegations of "wanton," "reckless," "bad-faith" or "fraudulent" conduct. *See Iron Mountain Sec. Storage v. Am. Specialty Foods*, 457 F.Supp. 1158 (E.D.Pa.1978). *Iron Mountain* was a commercial contract case involving an alleged breach of an options contract. The defendant counterclaimed for punitive damages on count two of its counterclaim, which attempted to state a claim in tort on the theory "that a party to a contract who either recklessly or intentionally commits a bad faith or malicious breach of the duties imposed by that contract for the purpose of causing harm to the other party to the contract is liable [in] tort" for damages proximately caused thereby and for puni-

---

**8.** *Public Service,* in part, held that no negligence action was available to a plaintiff who sought economic losses allegedly caused by a defendant's negligence in performing inspections of a generating turbine. The crux of plaintiff's claim, the court held, was that it did not get the benefit of its service contract with the defendant; therefore, the allegations were properly viewed as an action in contract, not tort. Recently, the Court of Appeals for the Fifth Circuit, sitting in admiralty, followed *PPG Industries* and applied *East River* to a service contract rendered in connection with the construction of a vessel. *Employers Ins. of Wausau v. Suwannee River SPA Lines*, 866 F.2d 752 (5th Cir.1989).

tive damages. *Id.* at 1163 (record citation omitted.)

Judge Luongo put his finger on why plaintiffs always try to turn contract disputes into tort actions:

> Although they derive from a common origin, distinct differences between civil actions for tort and contract breach have developed at common law. Tort actions lie for breaches of duties imposed by law as a matter of social policy, while contract actions lie only for breaches of duties imposed by mutual consensual agreements between particular individuals. In tort actions, damages are awarded to compensate the plaintiff for all loss suffered by breach of the duty, whereas in contract actions, damages are limited by the scope of the agreement and must be foreseeable at the time the agreement is made. If a tortfeasor breaches a duty imposed by society, a monetary levy beyond that which is compensatory may be imposed against him to punish the wrongdoing and serve as a deterrent; such "punitive damages" are not assessed for breach of mere contractual duties, however. These and other differences have characterized tort and contract as distinct forms of action, and the fact that tort rules usually provide greater advantages for plaintiffs' recoveries has led to "more or less inevitable efforts of lawyers to turn every breach of contract into a tort." W. Prosser, *Hornbook of the Law of Torts*, § 92 (4th ed. 1971): quotation from *id.* at 614 (footnote omitted). In this case, the difference in rules as to availability of punitive damages seems to have been a major factor promoting assertion of the tort claim since that is the only difference in

the relief requested under the two counts of counterclaim.

*Id.* at 1165 [9] (footnote omitted).

The court assumed that the option contract contained an implied covenant of good faith and fair dealing, i.e., a duty created by law rather than the intent of the parties. *Id.* at 1166. However, it refused to hold that merely because there was a breach of a legal duty, a tort remedy must exist under Pennsylvania law.

Rather, the court distinguished between those situations where a breach of contract has led to tort liability to third persons; e.g., personal injury resulting to a person not a party to the contract, or the insurance contract context in which unequal bargaining power and adhesion contracts are prevalent. *Id.* at 1166–67. Where, as in *Iron Mountain*, the injury caused by the breach was within the scope of the contract and the loss was "purely economic and compensable in an action on the contract itself," Judge Luongo did not "believe that Pennsylvania would superimpose tort law on that contract action merely to allow recovery of punitive damages for breach of the implied contract term." *Id.* at 1166. *See also Closed Circuit Corporation of America v. Jerrold Electronics*, 426 F.Supp. 361, 364 (E.D.Pa.1977) ("[a] claim *ex contractu* cannot be converted to one in tort simply by alleging that the conduct in question was wantonly done."); *Cincinnati Gas & Elec. Co. v. General Elec. Co.*, 656 F.Supp. 49, 63 (S.D.Ohio 1986) ("Punitive damages are not appropriate to and may not be awarded in an action for breach of contract and a pleader does not alter what is essentially an action for breach of contract by adding the words wilfully, wantonly and maliciously to a claim").

Nor, argues PECO, does the mere fact that a defendant may have negligently or

---

**9.** Cf. *Pennsylvania Glass Sand v. Caterpillar Tractor Co.*, 652 F.2d 1165, 1169 (3d Cir.1981): Tort law rests on obligations imposed by law, rather than by bargain, and the thrust of § 402A is that as a matter of public policy a duty should be imposed on manufacturers to "warrant" the safety of their products. The gist of a products liability tort case is not that the plaintiff failed to receive the quality of product he expected, but that the plaintiff has

been exposed, through a hazardous product, to an unreasonable risk of injury to his person or his property. On the other hand, contract law, which protects expectation interests, provides the appropriate set of rules when an individual wishes a product to perform a certain task in a certain way, or expects or desires a product of a particular quality so that it is fit for ordinary use. (footnotes omitted).

intentionally misrepresented the nature of its performance of a contract transform a breach of contract into tort. Its argument on this ground is heavily dependent on non-Pennsylvania cases such as *Unifoil Corp. v. Cheque Printers and Encoders Ltd.*, 622 F.Supp. 268 (D.N.J.1985).

In *Cheque Printers*, a third-party defendant moved to dismiss a fraud claim against it. The defendant premised a fraud claim on the theory that the third party knew that the sales contract specified a certain type of foil to be used in making lottery tickets, and knowingly supplied another kind. Judge Stern dismissed the fraud claim:

> On the fraud claim, [plaintiff] argues that *Spring Motors* does not directly address allegations of intentionally tortious conduct. That is true; but the reasoning of *Spring Motors* leads us to conclude that, as between commercial parties, New Jersey will not countenance such claims.... [Plaintiff] also argues that case law demonstrates that an action for fraud will lie, even in the presence of a contract. But such cases deal with fraud in the inducement, not the performance, of a contract. This Court, moreover, has construed the law of New Jersey to prohibit fraud claims when the "fraud contemplated by the plaintiff ... does not seem to be extraneous to the contract, but rather on fraudulent performance of the contract itself." [10]

*Id.* at 270–71 (*quoting Foodtown v. Sigma Marketing Systems, Inc.*, 518 F.Supp. 485, 490 (D.N.J.1980)); *see also, Unifoil Corp. v. CNA Ins. Cos.*, 218 N.J.Super. 461, 528 A.2d 47, 51 (App.Div.1987). Similarly, Judge Wolin of this district recently dismissed a fraud complaint based on allegations that a party had sold a plastic pro-

cessing machine with the knowledge that the machine would not meet contractual specification. In so deciding, he followed *Cheque Printers* and held that fraudulent performance of a contract between two commercial entities, as opposed to fraud extraneous to the contract, is not compensable in tort. *Werner & Pfleiderer Corp. v. Gary Chemical Corp.*, 697 F.Supp. 808 (D.N.J.1988).

In the power plant context, a federal court has held that a fraudulent breach of contract does not give rise to a separate tort action. In *Public Service Co. of N.H. v. Westinghouse Elec. Co.*, 685 F.Supp. 1281 (D.N.H.1988), the complaint alleged that the defendant fraudulently concealed facts about two failing turbine blades in a steam turbine electric generator which defendant supplied to the plaintiff. The plaintiff contended that if it had been told the true facts it would have had the blades inspected and would have avoided a subsequent breakdown and a resulting shutdown of the power plant.

The court indicated that defendant's duty to warn arose from the terms of the contract, rather than any common law duty. *Id.* at 1290. The gravamen of plaintiff's fraud claim was that it did not get the benefit of its bargain because the defendant's withholding of information breached the defendant's contractual duty to exercise reasonable professional knowledge and judgment. *Id.* As such, the plaintiff did not have an independent fraud claim under tort law. Instead, these allegations were properly regarded as another way of stating a claim for breach of contract. *Id.; see also, Nissho–Iwai Co. Ltd. v. Occidental Crude Sales, Inc.*, 729 F.2d 1530, 1550–51 (5th Cir.1984); *Flow Industries, Inc. v. Fields Const. Co.*, 683 F.Supp. 527 (D.Md. 1988); [11] *Pandjiris, Inc. v. Sunshine*

---

**10.** In *Spring Motors Distributors, Inc. v. Ford Motor Co.*, 98 N.J. 555, 489 A.2d 660 (1985), discussed *infra* page 215, the New Jersey Supreme Court held that a commercial buyer seeking damages for economic loss resulting from the purchase of defective goods may recover under the U.C.C., but not in strict liability or tort.

**11.** *Flow Industries* involved a negligent misrepresentation claim under Maryland law by a

commercial party which received a late delivery of pump motors. The plaintiff alleged that defendants misled him as to the delivery date. The court dismissed noting that there are some situations where a tort duty might arise but that it is "quite another thing to hold that whenever two businessmen have a contract between themselves, they are under a tort duty of care to one another for statements made during the course of their relationship." *Id.* at 530. "Where ...

*Stainless Tank & Equip.*, 655 F.Supp. 473 (E.D.Mo.1987); *Keene Corp. v. Insurance Co. of North America*, 597 F.Supp. 934, 945–46 (D.D.C.1984); *cf. Hi–Grade Cleaners, Inc. v. American Permac, Inc.*, 561 F.Supp. 643, 644 (N.D.Ill.1982) ("case law and the Restatement apparently confine the tort of negligent misrepresentation to persons and entities in the business of selling or supplying information which their customers will rely upon in taking some additional action.")

Here, PECO says, the plaintiffs' fraud claims (to the extent PECO understands them, see, *infra*) are based solely upon misrepresentations and concealments of facts by PECO with respect to operations at the Peach Bottom plant; that is, fraudulent statements relating to PECO's performance of the Owners Agreement. Such fraud is not extraneous to the contractual dispute among the parties, but is instead but another thread in the fabric of plaintiffs' contract claim. Like the plaintiffs' other tort claims, its fraud claim is undergirded by factual allegations identical to those supporting their breach of contract counts. *See* Agreement Art. 13, § 13.1 (PECO "shall keep ACE, DPL, and PSE & G fully informed of the status of the Station.") This fraud did not induce the plaintiffs to enter into the original agreement nor did it induce them to enter into additional undertakings. It did not cause harm to the plaintiffs distinct from those caused by the breach of contract; and the mere fact that disclosure of certain facts to plaintiffs earlier may have allowed them to take corrective action does not change the result. If a plaintiff knew, for example, that he was being supplied with unsuitable goods he could act to obtain other goods and therefore avoid any harm from the supplier's breach. However, in just this type of situation courts have held that a tort remedy does not exist. *See e.g., Cheque Printers*, 622 F.Supp. at 270–71; *Public Service Co.*, 685 F.Supp. at 1290.

PECO claims this case is no different. Plaintiffs merely allege that, but for

PECO's fraud, they would have discovered PECO's improper operation of the plant and would have taken remedial actions which would have prevented the incidents leading to the shutdown. In short, the plaintiffs would have minimized the damages caused by PECO's improper performance of its contractual duty to efficiently operate and maintain the plant. Such a claim is simply indistinct from the concurrent contract claim, argues PECO, and the economic loss doctrine mandates its dismissal.

Finally, the plaintiffs' allegations of physical damage to the Peach Bottom plant do not constitute an exception to the economic loss doctrine, rather they merely strengthen PECO's contention that this is a contract case and nothing more. Atlantic City Electric and Delmarva's amended complaint added specific allegations that PECO breached its contractual obligations to "[p]erform or contract for maintenance, renewals, and replacements required to keep the Station in safe and efficient operating condition and to protect the property...." Agreement Art. 12.1(d) quoted in ACE/DPL Amended Complaint ¶ 13. The amendment was intended to make clear that the "Owners Agreement is a maintenance contract, as well as an operating contract." ACE/DPL Supplemental Memorandum at 1. The same factual allegations constitute the basis for Atlantic City and Delmarva's attempt to recover for physical damages to the plant in tort as well as in contract.

PECO claims such allegations do not fall within the damage to property exception to the economic loss rule; rather, like damage to the defective product itself, damage to property which is the subject of a maintenance contract is compensable in contract only. If PECO's misconduct at Peach Bottom had resulted in physical damage to Delmarva Power's headquarters on King Street in Wilmington then Delmarva would have pled an exception to the economic loss rule since such property damage would not

[a] controversy concerns purely economic losses allegedly caused by statements made during the course of a contractual relationship between

businessmen, it is plainly contract law which should provide the rules and principles by which the case is to be governed." *Id.*

have been reasonably foreseen by the parties in making their contract. The risk that PECO would fail to live up to its contractual obligations and that Peach Bottom would be physically damaged, however, is like the risk that a product will malfunction or be destroyed by an internal defect, one which is both utterly foreseeable and within the scope of the contract.

PECO insists that *East River* and its progeny stand firmly for the proposition that these sort of risks will be contractually allocated by commercial parties, since they are so obviously known to the parties, and that public policy demands that such allocations be respected. PECO's duty to maintain the plant is firmly rooted in the Owners' Agreement, and it is the bargain they struck when the plaintiffs signed that agreement which must serve as the basis for recovering losses caused by violations of it. As Prosser and Keeton indicate:

> It is suggested that to the extent that the duty a party to a contract owes to another party or third party beneficiary is to be determined upon the first party's manifested intention, the obligation is contractual and entirely contractual. This would normally be so when the claim is for economic loss. Such a claim should not be translatable into a tort action in order to escape some roadblock to recovery on a contract theory.... Thus, a builder or a contractor would normally be subject to liability on a contract theory only ... for delays in construction or defects in construction that do not result in physical harm to persons or tangible things, *other than the thing itself that is being constructed or repaired.*

W. Prosser & W. Keeton, The Law of Torts, § 92 at 659 (5th ed. 1984).

The fact that the co-owners may have to expend money to repair or replace parts of the plant does not distinguish them from commercial buyers which must repair or replace a defective or destroyed crankshaft or turbine; each may have to make such expenditures if the contract so allocates this risk since, like plaintiffs' other tort claims, this is a risk of purely economic loss which the plaintiffs foreseeably faced if PECO did not live up to its contractual obligations.

### 2. *The Plaintiffs' Perspective*

The plaintiffs have, as might be expected, a totally different view of what this case is about. They say that, messy though it may be, tort law has traditionally been applicable to conduct involving the performance of contracts, particularly service contracts. In Pennsylvania, a tort recovery exists for a plaintiff harmed by a defendant who has improperly performed his contractual duties under a service contract *absent a valid exculpatory clause.*

Such is the law, and the plaintiffs argue that the economic loss cases cited by the defendant are not to the contrary. One set involves parties not in privity and are best viewed, according to plaintiffs, as proximate cause cases. The second, *East River* and its progeny, are applicable only to cases governed by the U.C.C. and do not, and do not purport to, overrule or affect the concurrent body of tort law governing misfeasance in the performance of service contracts.

Moreover, Pennsylvania law does not favor exculpatory clauses, and its public policy forbids a party from relieving itself from liability for conduct violative of statutory and regulatory safety codes. Indeed, even where such conduct is not present, tort liability is precluded only if the exculpatory clause is found to be enforceable, a decision contingent upon several potential factors including equality of bargaining power, the nature of the transaction, and the clarity of the exculpatory clause. And where conduct violative of law is present, such as here, PECO is simply mistaken in arguing that it violated duties imposed solely by contract. In short, plaintiffs contend that their tort claims are fully consonant with Pennsylvania law.

### a. The Misfeasance/Non-feasance Distinction

Plaintiffs cite to two recent Pennsylvania Superior Court decisions to support their position that the improper performance, as opposed to mere nonperformance, of a contract gives rise to tort liability under Penn-

sylvania law. The most recent of these decisions is *Hirsch v. Mount Carmel Dist. Ind. Fund*, 363 Pa.Super. 433, 526 A.2d 422 (1987).

*Mount Carmel* involved a contract which required the defendant to obtain financing for the plaintiffs' addition to their manufacturing plant. Economic damages were sought for the delay caused by the defendant's supposedly inadequate efforts in performing its contractual duties. The trial court had granted summary judgment for defendant on plaintiffs' contract and tort causes of action, based on the existence of an exculpatory clause in the contract.

On appeal, the Superior Court reversed because it found that plaintiff's complaint alleged negligent performance of contractual duties, *i.e.*, misfeasance; rather than a failure to perform, *i.e.*, non-feasance:

> The test used to determine if there exists a cause of action in tort growing out of a breach of contract is whether there was an improper performance of a contractual obligation (misfeasance) rather than the mere failure to perform (non-feasance).

*Id.* 526 A.2d at 423 *quoting Raab v. Keystone Ins. Co.*, 271 Pa.Super. 185, 412 A.2d 638 (1979) *appeal dismissed*, 496 Pa. 414, 437 A.2d 941 (1981).[12] The court held that a tort cause of action was properly stated under this test since the dilatory performance alleged by plaintiffs constituted misfeasance. *Id.* 526 A.2d at 424–25.

While acknowledging that this non-feasance/misfeasance distinction has not been explicitly used to distinguish between when a tort claim for economic damages will be maintainable and when it will not, the plain-

tiffs' point to several Pennsylvania cases which have allowed a tort recovery for economic loss between parties in contractual privity. For example, *Douglas W. Randall, Inc. v. AFA Protective Sys., Inc.*, 516 F.Supp. 1122 (E.D.Pa.1981), *aff'd without opinion*, 688 F.2d 820 (3d Cir.1982), is a case where a plaintiff was permitted to recover economic loss in tort against a defendant who breached a contract to service a burglar alarm system installed in plaintiff's jewelry store. The store was burglarized and the alarm did not go off because the defendant's repairman had turned it down too low. The jury decided this conduct was both negligent and grossly negligent. On post-trial motions the jury's verdict was attacked on the ground that an exculpatory clause in the service contract limited defendant's liability for negligence. The court rejected this challenge "[s]ince the jury found that the defendant was grossly negligent" and therefore "the exculpatory clause does not limit the defendant's liability to the plaintiff." *Id.* at 1127.[13]

Nor is the *Randall* case alone in allowing recovery of economic losses in tort for the negligent provision of services. *See Kairys v. Aetna Casualty & Sur. Co.*, 314 Pa.Super. 502, 461 A.2d 269 (1983) (Insurance broker held liable for breach of contract and negligence because he left a large gap in the plaintiff's medical malpractice coverage.); *Garbish v. Malvern Federal Sav. & Loan Ass'n.*, 358 Pa.Super. 282, 517 A.2d 547 (1986) *appeal den.* 516 Pa. 641, 533 A.2d 712 (1987) (Agent/lender held liable in tort to a plaintiff home buyer for improperly disbursing funds for the construction of plaintiff's house.[14]); *Kremer v.*

---

**12.** At issue in *Raab* was the propriety of the trial court's dismissal of a tort action filed by a plaintiff whose insurer had suspended payments of no-fault automobile benefits. The insured had been injured in an auto accident. The court affirmed the trial court's holding that the plaintiff only alleged that the insurer had failed to take certain actions, i.e., alleged non-feasance, and its dismissal of plaintiff's tort claims. Dismissal of the tort claims also mandated dismissal of plaintiff's request for punitive damages.

**13.** The court did not discuss the relationship between contract and tort; it did indicate, however, that under Pennsylvania law exculpatory clauses relieving a party of liability for negligence are valid, though they will be strictly construed against the party seeking to restricts its own liability. *Id.* Significantly, punitive damages were not at issue in the case.

**14.** Though the standard of care and breach were based on the application of negligence principles, the rights and responsibilities of the parties were assessed by reference to the contract

*Janet Fleisher Gallery, Inc.*, 320 Pa.Super. 384, 467 A.2d 377 (1983) (Agency case in which an art gallery was held liable for negligently selling a painting at too low a price); *Dubern v. Girard Trust Bank*, 454 F.2d 565 (3d Cir.1972) (Where agent bank's failure to disburse funds in accord with principal's instruction caused principal to incur tax liability the principal was not limited to contract damages but could recover the measure of damages which would most nearly make him whole).

Nor, say the plaintiffs, is such a tort remedy only available to "little guys" who purchase services from banks, lawyers, accountants and doctors. Rather, negligence actions for economic loss have been permitted when brought by a mill owner against an architect, *Bloomsburg Mills, Inc. v. Sordoni Construction Co.*, 401 Pa. 358, 164 A.2d 201 (1960), a bank versus an accountant, *Robert Wooler Co. v. Fidelity Bank*, 330 Pa.Super. 523, 479 A.2d 1027 (1984), and by a general contractor against an architect. *General State Authority v. Sutter Corp.*, 69 Pa.Cmwlth. 504, 452 A.2d 75 (1982).[15] Further, the plaintiffs contend that their action against PECO is essentially grounded in PECO's mismanagement of the Peach Bottom plant, and that mismanagement cases have traditionally sounded in tort. *Selheimer v. Maganese Corp. of Am.*, 423 Pa. 563, 224 A.2d 634 (1966); *Hunt v. Aufderheide*, 330 Pa. 362, 199 A. 345 (1938).[16]

In short, plaintiffs say that Pennsylvania law has consistently considered the improper performance of service contracts a concern of not only contract law, but also of tort. Indeed, states other than Pennsylvania also adhere to a distinction between contracts for the sale of goods and those for the provision of services.

*Consolidated Edison Co. v. Westinghouse Corp.*, 567 F.Supp. 358 (S.D.N.Y. 1983), involved a claim for economic loss by an electric utility. This loss had allegedly occurred because the defendant, which furnished equipment for and constructed a nuclear power plant for plaintiff, delayed informing the plaintiff of problems revealed by data generated as a result of inspections defendant had performed on steam generators. That part of plaintiff's complaint which sought relief for economic loss due to defendant's provision of defective equipment was dismissed under an *East River*-like analysis. With respect to plaintiff's allegations that the defendant delayed informing plaintiff of problems revealed by its inspection of the steam generators, the court held that this allegation did state a claim in tort under New York law because it alleged negligence in the performance of a service. *Id.* at 365–66; *accord, Howell v. Freifeld*, 631 F.Supp. 1222, 1225–26 (S.D.N.Y.1986); *see also Bryant v. Murray–Jones–Murray, Inc.*, 653 F.Supp. 1015, 1015 (E.D.Mo.1985). (Under Missouri law, the bar on recovery of economic loss in tort is not applicable to "an action based on the negligent rendition of services by a professional rather than on the negligent manufacture or provision of a defective product"); *but cf., Public Service Co. of N.H.*, 685 F.Supp. at 1287 (*supra,* note 6).

Plaintiffs contend that the present case falls squarely within this body of law. They allege misfeasance in the performance of a service contract, a contract to operate and maintain a nuclear power plant. These contractual duties required

---

which required the defendant to disburse funds as work on the house progressed "but only in proportion to the total contract price." 517 A.2d at 555. Damages were also based on the contract.

**15.** Some of the sting is taken out of these cases from plaintiffs' perspective because of the way *Bloomsburg Mills* and *Robert Wooler* dealt with the issue of damages. In *Bloomsburg Mills*, the court permitted a negligence action but indicated that the "proper measure of damage was the cost of restoration" of the improperly designed roof, *i.e.,* a contract remedy. 164 A.2d at 204.

Similarly, in *Robert Wooler,* while the court permitted a negligence action against an accountant, it cited with approval the notion "that the specific scope of an accountant's duty to a client must be determined primarily by the terms and conditions of the contract of employment." 479 A.2d at 1027.

**16.** Plaintiffs also note that there is an ongoing tort action by the stockholders of PECO against certain former officers of the company arising out of the same basic conduct of which plaintiffs here complained.

PECO to utilize its professional and managerial expertise. And like other professionals and managers PECO's failure to use reasonable care, or its intentionally tortious behavior, expose it to tort liability to its co-owners.

### b. Exculpatory Clauses

Nor does the fact that the Owners Agreement contains provisions dealing with the allocation of the risks of cessation of power production at Peach Bottom (see Agreement § 25.2: "[a]ll power replacement costs incurred by each [co-owner] as a result of the total or partial unavailability of its ownership share of [Peach Bottom] ... shall not be considered as a shared liability and shall be borne entirely by each [co-owner]") provide comfort to PECO on this motion.

While such exculpatory clauses may limit a contracting party's liability for negligent conduct, such clauses were interpreted in light of the following standards:

(1) contracts providing for immunity from liability for negligence must be construed strictly since they are not favorites of the law;

(2) such contracts must spell out the intention of the parties with the greatest of particularity and show the intent to release from liability beyond doubt by express stipulation and no inference from words of general import can establish it;

(3) such contracts must be construed with every intendment against the party who seeks the immunity from liability; and

(4) the burden to establish immunity from liability is upon the party who asserts such immunity.

*Cumis Insurance Society, Inc. v. Girard Bank*, 522 F.Supp. 414, 421 n. 22 (E.D.Pa. 1981) (citation and quotations omitted). The validity of such clauses also depends on factors such as equality of bargaining power and public policy. Pennsylvania has traditionally not given effect to exculpatory clauses which attempt to exculpate an actor for violations of statutes and regulations designed to protect human life. *Phillips Home Furnishings, Inc. v. Continen-*

*tal Bank*, 231 Pa.Super. 174, 331 A.2d 840 (1974) *rev'd on other grounds*, 467 Pa. 43, 354 A.2d 542 (1976); *Warren City Lines, Inc. v. United Refining Co.*, 220 Pa.Super. 308, 287 A.2d 149 (1971); *Cumis Ins. Soc., Inc.*, 522 F.Supp. at 421, n. 22 (Exculpatory clause valid only if it does not contravene any policy of law).

Nor may an exculpatory clause limit a defendant's liability for grossly negligent, wilful and wanton, or fraudulent behavior. *Douglas W. Randall, Inc.*, 516 F.Supp. at 1127 ("The exculpatory clause ... limits the defendant's liability only with respect to acts of negligence, and not for acts of gross negligence. Since the jury found that the defendant was grossly negligent, the exculpatory clause does not limit the defendant's liability to the plaintiff.")

As defendant's conduct involved wilful violations of NRC safety regulations and intentionally tortious behavior, such as fraud, PECO may not, consistent with the public policy of Pennsylvania, exculpate itself for such behavior. This is especially so where the behavior complained of could have resulted in a widespread harm. Indeed, plaintiff alleges PECO knew it was violating NRC regulations but did not inform the NRC, and led its co-owners to believe that all was well until it was too late for them to prevent harm to themselves or the public. Such behavior simply cannot be excused by contract.

### c. East River and its Progeny

The plaintiffs argue that *East River* and its progeny cannot be extended beyond the context in which they arose—contractual disputes governed by the Uniform Commercial Code. In fact, plaintiffs point out, one State Supreme Court which had adopted a position similar to that articulated in *East River* recently dealt with the issue of whether tort remedies are barred in the non-U.C.C. context and held that they are not.

In *Superwood Corp. v. Siempelkamp*, 311 N.W.2d 159 (Minn.1981), the Minnesota Supreme Court held that economic losses that arise out of commercial transactions, except those involving personal injury or damage to other property, are not recover-

able under the tort theories of negligence or strict products liability. Six years later the question of *Superwood*'s reach was before the same court in the case of *McCarthy Well v. St. Peter Creamery, Inc.*, 410 N.W.2d 312 (Minn.1987) *McCarthy Well* limited *Superwood* to those cases involving "commercial transactions" governed by Article 2 of the Uniform Commercial Code:

> The rationale behind the *Superwood* rule is that a recognition of tort actions in cases under the U.C.C. would upset the remedies contained in the U.C.C.; when the rationale is not applicable, i.e., when the U.C.C. does not apply, there is no reason for the *Superwood* rule to apply. *Id.* at 315.

Since the Peach Bottom Owners Agreement is not a sales contract governed by the comprehensive set of rights and responsibilities delineated in the U.C.C., the *East River* rule does not apply. And if some of the warranty cases seem to have import in the non-U.C.C. context, they cannot be read to have overruled, *sub silentio*, vast numbers of malpractice, mismanagement and agency cases in which a tort recovery has been afforded a plaintiff in contractual privity with the defendant. Instead, they are limited to commercial sales contract disputes in which a party complains that it received insufficient product value. Such cases must be left to the U.C.C. or else it would be regularly by-passed.

In the service context, parties do not contract against the backdrop of a comprehensive code like the U.C.C., but against the backdrop of a body of common law cases. Thus, they contract with the expectation that the negligent, or worse, performance of contractual duties will expose them to tort liability unless the contract validly insulates them from such liability.

### d. PECO's Economic Loss Cases Are Irrelevant

The plaintiffs say that the non-U.C.C. cases cited by PECO have nothing to do with parties in contractual privity. *Glass Kitchens*, the case in which the plaintiffs were businesses in Lancaster County who suffered economic loss because of TMI's

effect on tourism, and cases like it are proximate cause cases. They are based on the policy determination that the interests of society are best served by limiting the scope of a defendant's tort liability to plaintiffs who have suffered physical or property damage because of the defendant's conduct. These cases have nothing to do with disputes between parties in contractual privity, since the danger that one will cause economic loss to the other by improperly performing the contract is particularly foreseeable.

The plaintiffs insist that the economic loss doctrine has even less applicability to intentional torts such as fraud. This, plaintiffs claim, is made clear by an unpublished opinion by Judge Weiner of the Eastern District of Pennsylvania. *Southeastern Pa. Transp. Auth. v. Neoplan, U.S.A. Corp.*, No. 86–0180; Slip op. Sept. 29, 1986, 1986 WL 10649 (LEXIS, Genfed library, Dist. file).

In *Neoplan*, the plaintiff sued after the wheelchair lifts in 150 buses it had purchased from the defendant malfunctioned. Judge Weiner was faced with the question of whether plaintiff's negligence, strict liability, and fraudulent misrepresentation claims stated a cause of action. As the plaintiff sought to recover the cost of replacement and increased operating costs because of the defective lifts, the court dismissed the negligence and strict liability counts under the economic loss doctrine. However, the court refused to dismiss the fraud count:

> Under Pennsylvania law, the essential elements of a cause of action for fraudulent misrepresentation are summarized as follows: there must be (1) a misrepresentation; (2) a fraudulent utterance thereof; (3) an intention by the maker that the recipient will thereby be induced to act; (4) justifiable reliance by the recipient upon the misrepresentation; and (5) damage to the recipient as the proximate result. *Scaife Co. v. Rockwell–Standard Corp.*, 446 Pa. 280, 285 A.2d 451, 454 (1971); *Savitz v. Weinstein*, 395 Pa. 173, 177–78, 149 A.2d 110, 113 (1959); *Neuman v. Corn Exchange National*

*Bank and Trust Co.*, 356 Pa. 442, 450, 51 A.2d 759 (1947). *See also, Marian Bank v. International Harvest Credit Corp.*, 550 F.Supp. 456, 461 (E.D.Pa.1982). Conspicuously absent from this list of elements is any requirement that the recipient suffer some type of physical harm. Indeed what can be gleaned from these cases is that the tort of fraudulent misrepresentation has developed primarily to protect interests of a financial or commercial character involved in the course of business dealings. In fact, the tort of fraudulent misrepresentation has traditionally afforded recovery for purely "economic losses."

*Id.*

Moreover, plaintiffs aver that the case cited by PECO to support its argument that a fraud allegation falls under the economic loss doctrine is, say plaintiffs, unpersuasive. They point out that the *PPG Industries* case, 681 F.Supp. 287, contained no analysis of the wisdom or propriety of applying the economic loss doctrine to intentionally tortious conduct.[17]

The express exceptions to the economic loss doctrine indicate its inapplicability to fraud allegations. Since fraud usually does not result in physical harm or property damage, it ordinarily does not suffice to state a claim for tort relief in Pennsylvania under the defendant's view of the doctrine. This simply is not the law. Rather, when a defendant's misrepresentations induce a plaintiff to continue performing under a

contract, and the plaintiff later suffers economic injury thereby, the plaintiff has a fraud claim in addition to a contract action.

In sum, plaintiffs contend that PECO is attempting to conflate two legal principles applicable in other contexts, *i.e.*, the *East River* rule and the economic loss doctrine, into one grand theory which denies a tort recovery to any plaintiff economically harmed by a defendant's improper performance of a contract—regardless of the particular nature of the contractual relationship. While we all might ponder the desirability of such a unified approach, plaintiffs argue that there is no indication that the Pennsylvania Supreme Court is moving toward such a synthesis. On the contrary, tort relief for parties in privity has been permitted despite the existence of the economic loss doctrine and *since East River;* and thus PECO's motion must be denied.

### 3. *The Court's Interpretation*

A review of the competing arguments demonstrates the difficulty of our task. Both the defendant's and the plaintiffs' arguments are well-reasoned and each is grounded in Pennsylvania case law. But which accurately depicts the law of the Commonwealth of Pennsylvania? There is, we think, no objectively correct answer to this question. For most of the relevant case law cited by the parties or found by the court was not decided by Pennsylvania's Supreme Court but by its Superior

---

**17.** Unfortunately for plaintiffs, *Neoplan*, because of its unpublished nature, is not much more helpful. Because other courts were not an intended audience, Judge Weiner's opinion does not indicate the nature of the fraud plaintiffs alleged.

Perhaps this is not surprising since the contract-fraud cases cited by both parties are generally confusing. Each relies to some extent on the somewhat unilluminating distinction between duties imposed by the contract and those imposed by law.

In *Closed Circuit Corporation of America v. Jerrold Electronics*, 426 F.Supp. 361 (E.D.Pa. 1977), for example, a plaintiff brought a lawsuit seeking compensatory and punitive damages because the defendant seller "wilfully, knowingly, maliciously, and fraudulently [sold] plaintiff

faulty and defective electronic televisions which did not function as promised." *Id.* at 361.

The plaintiff pled fraud but the court indicated that it was really a contract action to which the U.C.C. applied. Insofar as the plaintiff's losses stemmed from poor manufacturing, tort recovery was barred: "[a] claim *ex contractu* cannot be converted to one in tort simply by alleging that the conduct in question was wantonly done." *Id.* at 364. To state a claim in fraud, "the nature of the duty violated [must] arise[ ] not from the contract but from the principle of fair dealing...." *Id.* Mere failure of the goods to meet contract requirements did not rise to this level; however, if the defendant had represented that the goods had been accepted by the Federal Communications Commission when in fact they had not been and plaintiff relied on this representation, a fraud claim might be pled.

Court or by federal courts. And the case law is often contradictory and confusing, as judges have been most concerned to deal with the cases presented to them and not with whether their decisions brought harmony to the law. *Cf.* W. Prosser & R. Keeton, *Prosser and Keeton on Torts,* § 92 ad 658 (5th ed. 1984) ("The distinction between tort and contract liability, as between parties to a contract, has become an exceedingly difficult distinction to make. It would not be possible to reconcile the results of all cases.")

PECO suspects that the prime reason we are faced with this choice is that punitive damages are not available for breach of contract. *Argo Welded Products, Inc. v. J.T. Ryerson Steel & Sons,* 528 F.Supp. 583, 586 (E.D.Pa.1981); *Standard Pipeline Coat. v. Solomon & Teslovich,* 344 Pa.Super. 367, 496 A.2d 840, 844 (1985). Under Pennsylvania law, the damages ordinarily available to a plaintiff in tort and contract do not greatly differ, though they may be stated in somewhat different terms.[18] Whether stated in terms of making plaintiffs whole, or in putting them in the place they would have been had PECO lived up to its contractual obligations, compensatory relief is available to the plaintiffs. In this case, where the plaintiffs' loss consists of mostly economic loss and damage to a nuclear power plant, contract damages can make them whole. Unlike a patient who is permanently injured by a negligent surgeon or a collector of rare art whose painting is intentionally destroyed and for whom money damages would be only a substitute for an irreplaceable loss, these plaintiffs can be restored by cold cash.[19] But the big prize, even bigger than the potentially huge compensatory award plaintiffs could recover, would be an award of punitive damages, granted not to compensate the plaintiffs but to deter and punish PECO's allegedly outrageous behavior. *Martin v. Johns–Manville Corp.,* 508 Pa. 154, 494 A.2d 1088, 1096 (1985). Such an award is available, as we have indicated, only in tort.

■ Motive aside, plaintiffs are entitled to prevail on this motion unless we are convinced that the pleaded facts do not state a cause of action in tort. The mere fact that plaintiffs have a contract action does not preclude them from stating a cause of action in tort. And we think, quite candidly, that PECO is quite right in suggesting that, at its core, this is a contract action. Asking two questions helped us reach this conclusion: (1) what is the nature of the loss suffered by the plaintiffs? and (2) from what source did the defendant's duty to refrain from the conduct complained of primarily derive?

With respect to this first question, it is clear that the harm suffered by the plaintiffs has been predominately economic in nature. The plaintiffs allegedly have been forced to pay increased maintenance and repair costs, they have had to pay a share of the fines assessed by the NRC, they have had rate penalties imposed upon them by state regulatory authorities,[20] they have spent money to replace power usually produced by Peach Bottom, and they have lost profits. And while it is true that plaintiffs allege that the Peach Bottom plant was physically damaged because of PECO's failure to maintain it, *East River* and *Hilton–Davis*'s focus on plaintiffs' bargain makes clear that such damage in and of itself need not necessarily determine whether a tort remedy is available.

The plaintiffs' complaints allege that the Owners Agreement is essentially an operations and maintenance contract whereby

**18.** In the tort context, Pennsylvania courts have said that plaintiff should be compensated to the full extent of the harm suffered, and no further except insofar as punitive damages are available. *Incollingo v. Ewing,* 444 Pa. 263, 299, 282 A.2d 206 (1971). In contract, the general rule is that the injured party should be placed in the position he would have been in had the contract not been breached. *Harman v. Chambers,* 358 Pa. 516, 57 A.2d 842 (Pa.1948). Lost profits may be recoverable if proved, in either a tort or

contract case. *SHV Coal, Inc. v. Continental Grain Co.,* 376 Pa.Super. 241, 545 A.2d 917, 922 (1988).

**19.** We assume they have no particularly emotional attachment to the Peach Bottom plant.

**20.** PSE & G asserts that it has had over $70 million in rate penalties imposed upon it by the Board of Public Utilities of New Jersey. PSE & G Opp. Brief at 23.

PECO is to operate and maintain the Peach Bottom Nuclear Plant on behalf of itself and its co-owners, who share, in proportion to their ownership, the benefits and burdens of operating the plant. As previously noted, PECO agreed to "[p]erform or contract for maintenance, renewals, and replacements required to keep [Peach Bottom] in safe and efficient operating condition and to protect the property...." Agreement Art. 12.1(d). In short, plaintiffs bargained for a well-maintained plant. They allege that the defendant breached this aspect of its contractual duties.

As such, we find it analytically difficult to distinguish between such property damage and damage to a defective product itself. When I bargain for a product, I bargain for a working product. When it breaks or destroys itself, I lose the benefit of my bargain. Here, plaintiffs bargained for a well-maintained nuclear plant. They allege that it was poorly maintained and suffered physical damage, *i.e.*, they lost the benefit of their bargain. In the products context, such an allegation would leave a plaintiff with only a warranty remedy under Pennsylvania law.

So too with plaintiffs' other damage allegations. Paragraph 11.1 of the Owners Agreement provides that in performing its operation and maintenance duties at Peach Bottom PECO "shall act as an independent contractor responsible for the result to be obtained, *i.e.*, generation of power and energy at the station as economically and reliably as is practicable.... PE[CO] itself having sole responsibility for the specific manner of attaining that result...." In essence, the plaintiffs bargained for an efficient nuclear power plant which would provide them with a steady source of power. They allege that they were deprived of the benefits of this bargain because of PECO's improper management and operation of the plant. *See King v. Hilton Davis*, 855 F.2d at 1051 ("It is [plaintiff's] bargain that determines his or her economic loss and whether he or she has been injured beyond that loss.") They seek compensatory damages in tort and contract for these losses, *i.e.*, they seek to be made whole or to be placed in the same position

they would have been in had the contract been carried out.

Plaintiffs seek no damages which cannot be viewed as the result of their failing to get what they bargained for. PECO's conduct did not result in physical harm to the CEO of PSE & G (aside from a heavy dose of stress) or to Delmarva's headquarters, but resulted in physical harm to the plant PECO contractually agreed to maintain and a loss of power from the plant it contractually agreed to efficiently operate.

And turning to the second question, we again see that PECO's duties to the plaintiffs arise primarily, if not wholly, out of the Owners Agreement. Defendant has a duty under the contract to efficiently, or in the contract terms to "economically and reliably," operate and maintain the plant. The defendant also has a contractual duty to keep the plaintiffs informed of the status of the plant. The plaintiffs allege breaches of these specific contractual duties. In fact, given the nature of PECO's contractual obligations, the contract could certainly be interpreted under Pennsylvania to include an implied promise by PECO to render its services with reasonable skill and care. *Bloomsburg Mills*, 164 A.2d at 203; *Prosser*, § 92 at 658. Any misrepresentations about the status of the plant would violate PECO's contractual duty of good faith and fair dealing. *See* Restatement (Second) of Contracts § 205 (1979).

Thus, this case rationally and logically can be viewed as a contract case. But this, of course, is not determinative since tort and contract damages have often been awarded for the same misconduct. As such, another useful analytical question is: what would PECO's duty to the plaintiffs have been in the absence of a contract?

Clearly Pennsylvania law would impose no duty upon PECO to avoid purely economic loss to the plaintiffs if they were not in contractual privity. *See, e.g., Margolis*, 543 A.2d at 1240. But PECO would be under a tort duty to avoid causing physical harm to the plaintiffs or their property. *Id.; see generally*, Prosser, § 92 at 657–58;

*Cf.* Restatement (Second) of Torts § 323.[21] But, of course, if the "injury to the product itself" analogy applies, then this duty is really one to avoid causing physical harm to property of the plaintiffs which was not the subject of the maintenance contract.

Also, plaintiffs' fraud and misrepresentation claims are intrinsically related to the contract. However, this may be said of many fraud claims; further, most fraud claims involve purely economic loss and therefore the economic loss doctrine cannot rationally preclude such claims. This being said, still these claims are somewhat different than the usual fraud claim.

The plaintiffs do not allege that the defendant's misrepresentations induced them to enter into the Peach Bottom joint venture (or to buy a product, stock, or enter into a new venture), which would be the usual type of fraud claim; rather, they argue that the defendant's misrepresentations prevented them from acting to prevent the shut-down. Indeed, § 525 and § 552 of the Restatement of Torts, which deal with liability for fraudulent and negligent misrepresentations, do not seem to be drafted with this sort of claim in mind, if the examples and discussions following these sections are indicative of their scope. *See* Restatement (Second) of Torts § 525, at 55–58, and § 552 at 126–39.

And while PECO, as the plant's licensed operator, is legally bound to be candid with the NRC regarding the status of the plant and is required to bring to the NRC's attention any aspect of the plant's operations not in compliance with NRC regulations, see 42 U.S.C. § 5846, its duty to the plaintiffs arises from their mutual agreement to build and operate a nuclear power plant. Plaintiffs seek to sustain their fraud claims by arguing that the defendant's misrepresentations about its performance induced

them to continue performing under the Peach Bottom Owners Agreement and prevented them from coming in and cleaning house. This remedial action could, plaintiffs contend, have prevented much of the harm caused by PECO's conduct. Whether this is true is not in issue, for we accept this allegation, as we must, as true for the purpose of this motion. Even so, is it not usually the case that anytime a defendant misrepresents the status of its contractual performance and therefore postpones the plaintiff's awareness of a breach, that it prevents the plaintiff from taking action to minimize the harm caused by the breach or to end the contractual relationship? Moreover, when this is what the fraud consists in, the damages caused thereby are likely to be, as they are here, identical to those caused by the breach of contract. No distinct harm results.

We cannot deny that PECO is alleged to have engaged in conduct of obligations imposed by law as well as those created by contract. If plaintiffs are correct, PECO tolerated and knowingly failed to bring to the NRC's attention a pattern of conduct it knew to be clearly unlawful. PECO's operators slept at the switch of a nuclear power plant, not once but many times, and PECO did nothing. But PECO's duty to abide by applicable safety regulations is not one created to especially benefit PSE & G, Atlantic City Electric and Delmarva Power. From a safety perspective, PECO owed no greater duty to its co-owners than it did to the general public. Whatever special duty PECO owed to its co-owners was related to their ownership interests in the plant and was created, at least initially,[22] by the Owners Agreement. In fact, one might spend hours pondering the fairness of a rule which would allow a co-owner to recover tort damages for economic loss caused by its co-venturer's

---

**21.** § 323. Negligent Performance of Undertaking to Render Services.

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if

(a) his failure to exercise such care increases the risk of such harm, or
(b) the harm is suffered because of the other's reliance upon the undertaking.

**22.** In the sense that they very creation of a contractual relationship can bring into play an array of legally implied and imposed duties.

breach of NRC safety regulations, but denies such a recovery to a small business which is not a party to the Owners Agreement and loses significant revenues because of such a violation.

In sum, if given our head, we would be inclined to hold that this is simply a contract case. But even though this is so, we cannot, at this stage of the case, dismiss the plaintiffs' tort claims. There is simply too much Pennsylvania case law which subjects a party to tort liability for improperly performing its contractual duties. Indeed, the Pennsylvania Superior Court, which has denied recovery to plaintiffs not in privity who have not suffered damage to themselves or their property, *see, e.g., Glass Kitchens,* 542 A.2d 567, has articulated the nonfeasance/misfeasance distinction. *Hirsch v. Mount Carmel Dist. Ind. Fund,* 526 A.2d 422. Further, there are a large number of cases in which plaintiffs have recovered economic loss caused by a defendant's negligent performance of a contract. *See, supra,* at 203–204.

The picture, blurry though it may be, that emerges from the Pennsylvania cases we have cited seems to be essentially as follows. First, the economic loss rule denies a tort recovery to plaintiffs who have suffered only economic loss because of someone's negligence. However, this doctrine seems to serve as a way of delimiting persons' or businesses' tort liability. The rule expresses a policy determination that the need for economic activity and to make injured plaintiffs whole is best balanced by allowing tort recovery only to those plaintiffs who have suffered physical harm or property damage at the hand of parties with whom they are not in contractual privity. As there are a myriad of ways economic loss could be caused to unforesee-

able plaintiffs, useful commercial activity could be deterred if economic actors were subject to such liability.

Second, this doctrine has not been applied to parties in contractual privity. Pennsylvania courts have regularly subjected a defendant to tort liability if it misperforms a contract and causes harm, including economic loss, to the party with whom it contracted. This is perhaps explained by the fact that it is particularly foreseeable that the other party to the contract will suffer economic loss because of defendant's breach. If these cases are to be explained on the basis that they involve duties that the law imposes upon certain professionals as a matter of Pennsylvania public policy, we suspect that there might well be sound public policy reasons for imposing such duties upon a public utility running a nuclear power plant.[23]

Third, in some circumstances, such tort liability may be disclaimed. Such exculpatory clauses will be construed strictly, however, and are void if they conflict with public policy. *See e.g., Cumis Insurance Society, Inc.,* 522 F.Supp. at 421 n. 22; Restatement (Second) of Contracts § 195. The validity of such a clause also depends on factual circumstances inappropriate for resolution on a motion to dismiss.

Fourth, Pennsylvania law cases have, for the most part, not extended *East River* out of the warranty context. The exception is the *PPG Industries* case, *supra,* in which the service performed was testing a product to see if it met the plaintiffs' needs. This product was later sold to the plaintiffs by the party which did the testing; its failure to perform as warranted was the cause of the harm to plaintiff. The case is most plausibly read as a products case.

---

**23.** If they are to be explained, as PECO attempted to do before the plaintiffs' allegations of physical damage were made clear, on the basis that property damage was present, they are indistinguishable from the case before us.

Another explanation rests in our belief that contracts involving the application of human reasoning and professional skill, as well as the exercise of managerial discretion, must invariably be measured by concepts borrowed from tort law. Whether a company has breached a

management contract, it seems to us, raises a more subtle question than whether a crankshaft has lived up to its warranty. Moreover, it is a question which will have to be answered not only by looking to the contract, but also by considering how a reasonable manager would have performed under the same circumstances.

The borrowing of tort concepts need not, however, turn the action into one in tort, or allow the plaintiff to recover tort, rather than contract, damages.

More importantly, no Pennsylvania court has discussed *East River* in a published opinion. We are reluctant to extend its mode of analysis to a contract not governed by the U.C.C., even though this seems to be a case involving a contract and parties to which such an approach is particularly appropriate. It may be that *East River*'s analysis of the boundary between contract and tort is so persuasive that the Pennsylvania Supreme Court would apply it in the context of a services contract dispute. But this we cannot say without speculation.[24]

As of today, a substantial body of Pennsylvania case law holds a defendant liable in tort for misfeasance in the performance of a contract. And plaintiffs allege facts suggesting that PECO's conduct may constitute the quintessential case of misfeasance. They allege that PECO, at the very least, negligently performed its duties, and, at worst, wilfully and fraudulently tolerated conditions that blatantly violated NRC safety regulations *and did so in the knowledge that this misfeasance could gravely harm its co-venturers* and the public. Moreover, the plaintiffs allege that their property was physically damaged because of the defendant's improper maintenance of the plant. Based on our review of Pennsylvania law, we cannot say with certainty that these allegations fail to state a claim in tort; we could only venture a guess that Pennsylvania law would be extended to bar such a claim.

On a motion to dismiss we will not hazard such a guess. The imposition of common law tort duties can often depend upon policy considerations heavily influenced by the factual context from which a case emerges. Development of the factual record will provide us with greater insight into the relationship among these parties and what this relationship's implications are with respect to Pennsylvania public policy.[25]

Moreover, we remain interested in the potential applicability of agency, bailment, and joint venture/fiduciary duty principles to this case. Our capacity to digest economic loss cases was taxed by this motion; we, frankly, have not been able to explore these other areas of the law nor have the parties addressed them. At a later time, we undoubtedly will explore them and retrace the ground we covered today at a time when the limited scope of inquiry afforded by Rule 12(b)(6) and a sparse factual background will not obscure the relevant topographical features. In the interim, we may be provided with new decisions of the Pennsylvania courts which will light our way. For now, we are not convinced that dismissal is appropriate under Pennsylvania law; therefore, prudence and the requirements of Rule 12(b)(6) dictate our denial of PECO's motion.

Before moving on, we pause to mention the question of damages. In the future we will be asked to determine what potential damages are available to these plaintiffs on their tort claims (and of course, we may be asked to grant summary judgment for defendant on plaintiffs' tort claims). The fact that the plaintiffs may possess tort claims, or that defendant's conduct might be evaluated by reference to negligence principles, does not necessarily mean that they will be entitled to damage instructions on punitive damages or other tort concepts. As has been noted, in many of the econom-

---

**24.** Our refusal to extend *East River* should, of course, not be read as implying disrespect for the Third Circuit's ruling in *Aloe Coal, supra,* 816 F.2d at 110. On the contrary, we agree wholeheartedly with *Aloe Coal;* however, this case presents the question of whether *East River* applies to contracts *not* governed by the U.C.C. This question is more difficult to answer because of the cases cited by the plaintiffs.

**25.** For example, Pennsylvania could view the imposition of tort liability upon one of its public utilities vis-a-vis a co-venturer as burdensome and inimical to its citizen's best interests. This may especially be the case where its public utility exacted no profit from its role as the operating member of the joint venture.

On the other hand, the possibility of such tort liability could lead PECO to be more forthcoming with information about the status of operations at Peach Bottom and more responsive to input from its co-venturers, thereby resulting in a more efficient and safer nuclear plant. Moreover, such liability could benefit PECO potentially if it had a dispute with PSE & G about operations at the Salem plant.

ic loss cases which have turned on tort principles, the responsibility of the defendant for damages was often determined primarily by reference to the contract. *See, e.g., Garbish,* 517 A.2d 547; *Bloomsburg Mills,* 164 A.2d 201; *Robert Wooler Co.,* 479 A.2d 1027, *discussed supra,* notes 11, 12 and 13, respectively. We have already mentioned our belief that contract damages are well-suited to claims of economic loss, such as we have here. And, indeed, the question of whether punitive damages may be imposed upon PECO based on conduct for which it has already been fined, *i.e.,* civilly punished, by the NRC is one to which the parties may usefully devote their attention.

Given our finding as to Pennsylvania law, we need not discuss New Jersey law at any length. A brief overview will suffice. The New Jersey Supreme Court has held, in an impressive opinion cited by the Supreme Court in *East River,* that a commercial buyer who suffers economic loss because of a defective product cannot recover in tort but is limited to its remedies under the Uniform Commercial Code. *Spring Motors Distributors v. Ford Motor Co.,* 98 N.J. 555, 489 A.2d 660 (1985). However, while the case contains language indicating that the analysis it articulates has implications for non-warranty cases,[26] it also contains passages emphasizing that the court's decision was heavily influenced by the need to avoid disrupting the "carefully conceived system of rights and remedies" embodied in the U.C.C. *Id.* at 577; 489 A.2d at 671; *see also, Henry Heide, Inc. v. WRH Products Co., Inc.,* 766 F.2d 105, 109 (3d Cir.1985) ("The basic rationale of *Spring Motors* is that the U.C.C. provides an adequate and integrated set of rights and remedies for a disappointed commercial buyer of goods.)

Indeed, as in Pennsylvania, several New Jersey cases have permitted plaintiffs in privity with a defendant to recover in tort for economic loss caused by a defendant's improper performance of a contract. *See, e.g., E.A. Williams, Inc. v. Russo Development Corp.,* 82 N.J. 160, 411 A.2d 697 (1980) (negligent surveyor held liable for economic loss suffered by property owner); *Paris of Wayne, Inc. v. Richard A. Hajjar Agency,* 174 N.J.Super. 310, 416 A.2d 436 (App.Div.1980) (real estate broker liable for consequential damages to manufacturing company. Consequential damages representing the loss of the benefit of plaintiff's bargain were appropriate in tort or contract); *but cf. New Mea Const. Corp. v. Harper,* 203 N.J.Super. 486, 497 A.2d 534 (App.Div.1985) (homeowner's counterclaim seeking to attach personal liability to corporate builder's principal based on her negligent supervision of construction sounds in contract not tort). Further, fraudulent and negligent misrepresentations claims have stood side-by-side with contract claims in New Jersey cases. *Rodriguez v. Cardona Travel Bureau,* 216 N.J.Super. 226, 523 A.2d 281 (Law Div.1986) (travel agents are fiduciaries and liable for foreseeable loss flowing from their negligence).

Such a case was decided by Judge Fisher of our district court. *B.F. Hirsch v. Enright Refining Co.,* 577 F.Supp. 339 (D.N.J. 1983), *modified,* 751 F.2d 628 (3d Cir.1984). The plaintiff in *Enright Refining* was a jewelry manufacturer who contracted with the defendant to refine the plaintiff's scrap gold. During the course of their contractual dealings, the defendant began retaining some of the refined metal in addition to the monetary fee it received to refine the gold.

---

**26.** On the general distinction between tort and contract the court had this to say:

The demarcation of duties arising in tort and those arising in contract is often indistinct, but one difference appears in the interests protected under each set of principles. The purpose of a tort duty of care is to protect society's interest in freedom from harm, *i.e.,* the duty arises from policy considerations formed without reference to any agreement between the parties. A contractual duty, by comparison, arises from society's interest in the performance of promises. Generally speaking, tort principles, such as negligence, are better suited for resolving claims involving unanticipated physical injury, particularly those arising out of an accident. Contract principles, on the other hand, are generally more appropriate for determining claims for consequential damage that parties have, or could have, addressed in their agreement. 98 N.J. at 561, 489 A.2d at 663.

The plaintiff was not informed of this change, the defendant issued reports to plaintiff which concealed this retainage, and the plaintiff continued to use the defendant's services. Judge Fisher found that the defendant's retaining of the gold without disclosure was a breach of contract and also constituted fraudulent misrepresentation.[27] *See also, Perth Amboy Iron Works v. Am Home*, 226 N.J.Super. 200, 543 A.2d 1020 (App.Div.1988) (plaintiff potentially had a fraudulent misrepresentation action based on allegations that defendant's fraud caused plaintiff to buy a yacht and to retake possession of it after repairs to engine were made); *Shaitelman v. Phoenix Mut. Life Ins. Co.*, 517 F.Supp. 21, 23 (S.D.N.Y.1980) ("Here, the defendant allegedly breached a duty independent of the contract by making affirmative misrepresentations to induce plaintiff's continuing performance and reliance. Upon these circumstances, a claim for fraudulent misrepresentation pleaded with a claim for breach of contract will survive a motion to dismiss"); *cf. H. Rosenblum v. Adler*, 93 N.J. 324, 461 A.2d 138, 143 (1983) ("Recovery of economic loss, due to negligent misrepresentation by one furnishing a service, has long been permitted when there existed a direct contractual relationship between the parties ...").

And in the products context, Senior Judge Cohen held that a tort remedy did exist for a commercial fisherman who alleged that the defendant failed to warn him of a defect it discovered after selling the fisherman a crankshaft for his fishing boat. The crankshaft exploded ad the fisherman suffered economic losses. The court distinguished between a strict liability claim for manufacturing a defective product and an allegation that the defendant failed to warn the plaintiff of a danger it learned about after the sale:

Whatever the merits of adopting a rule that views defects in a product as part of the parties' bargain and thus within the law of sales, it is much less tenable to presume that the buyer has bargained away the manufacturer's obligation to warn of defects that later come to the manufacturer's attention. A duty to warn of a product's defects of which the seller becomes aware goes not to the quality of the product that the buyer expects from the bargain, but to the type of conduct which tort law governs as a matter of social and public policy. To hold otherwise would impermissibly allow a manufacturer who is aware that it has a defective product on the market to hide behind its warranty while the buyer unknowingly uses it.

*McConnell v. Caterpillar Tractor Co.*, 646 F.Supp. 1520, 1526 (D.N.J.1986). (Citation omitted), (*quoting Miller Industries v. Caterpillar Tractor Co.*, 733 F.2d 813, 818 (11th Cir.1984)); *But cf. Arkwright–Boston Mfrs. Mut. v. Westinghouse Elec.*, 844 F.2d 1174 (5th Cir.1988) (defendant's failure to warn buyer of design defect did not give rise to tort liability); *Long Island Lighting Co. v. Transamerica Delaval*, 646 F.Supp. 1442 (S.D.N.Y.1986) (fraudulent concealment of information regarding diesel generators for a nuclear power plant did not give rise to a separate fraud claim when the fraud alleged was unrelated to and not independent of the breach of contract).

Moreover, like Pennsylvania law, New Jersey law permits a party to contractually limit its liability, but only in certain circumstances. New Jersey will not enforce an exculpatory clause when the parties to the agreement have unequal bargaining power, when it attempts to exculpate a party for its wilful and wanton misconduct or an intentional tort, or when the clause is contrary to public policy. *Tes-*

---

**27.** On appeal, the Third Circuit indicated that in New Jersey:

"The correct measure of damages for breach of contract is the expectation measure or the benefit of the bargain. In New Jersey, the benefit of the bargain may be used as the measure of damages for fraud as well. 751 In this case, the district court found that the defendant promised to account for 100% of the gold and silver determined by chemical assay. The district court correctly awarded the full value of the gold and silver retained because that would put the parties in the same position as if the contract or promise has been filled." 751 F.2d at 634. (Citations and quotations omitted.)

*sler & Son v. Sonitrol Sec. Systems*, 203 N.J.Super. 477, 497 A.2d 530, 533 (App.Div. 1985); *Swisscraft Novelty Co., Inc. v. Alad Realty Corp.*, 113 N.J.Super. 416, 274 A.2d 59, 62–64 (App.Div.1971).

Indeed, these very same parties were co-plaintiffs in an action against Westinghouse Electric Corporation. In that action, the plaintiffs alleged that the reactor trip breaker at the Salem Nuclear power plant failed because of Westinghouse's defective manufacturing and servicing of the breakers. Plaintiffs sought economic losses suffered when the NRC shut the plant down for two months to investigate the failure, and pled claims for negligence, wilful and wanton misconduct, and misrepresentation. On a motion for summary judgment, Judge Neagle held, *inter alia*, that: (1) there were factual questions relating to equality of the parties bargaining power which precluded giving effect to an exculpatory clause limiting Westinghouse's liability; (2) that given the nature of the contract, public policy might require voiding the exculpatory clause; and (3) that there was evidence of wilful and wanton misconduct to which an exculpatory clause would not apply. *Public Serv. Elec. & Gas Co. v. Westinghouse Elec. Co.*, No. L–08912–84 (N.J. Super.Ct., Law Div., December 13, 1988).[28]

In sum, we cannot opine that the plaintiffs have failed to state a tort claim under New Jersey law either. We do wish to make one final comment. Our review of Pennsylvania and New Jersey law suggests that many of the so-called tort cases cited by the plaintiffs are really contract cases in which tort principles have been borrowed to deal with liability. That is, they are *assumpsit* rather than *trespass* actions. Fighting over whether an action is in tort or contract in situations involving economic loss might cease if punitive damages were available for breaches of con-

tract involving conduct egregious enough to obtain such damages in a tort suit. Certain breaches of contract may very well be as outrageous and as inimical to the public interest as a tort. It may be that a society which utilizes punitive damages to deter outrageous behavior may wish to apply them to particular breaches of contractual duties, especially when widespread harm is likely to accompany such a breach. But this is for others to decide.

## V. MOTION TO DISMISS FOR FAILURE TO PLEAD FRAUD WITH PARTICULARITY

PECO has moved to dismiss the plaintiffs' fraud claims on the alternative ground that they are not pled with the requisite particularity. Federal Rule of Civil Procedure 9(b) provides in relevant part that:

[i]n all averments of fraud ... the circumstances constituting fraud ... shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

The Court of Appeals for the Third Circuit has read Rule 9(b) as requiring the plaintiff to plead all but the second and fourth of the following factors with particularity, regardless of whether the action is based on state law:

(1) [a] specific false representation of material facts; (2) knowledge by the person who made it of its falsity; (3) ignorance of its falsity by the person to whom it was made; (4) the intention that it should be acted upon; and (5) the plaintiff acted upon it to his damage.

*Christidis v. First Pennsylvania Mortgage Trust*, 717 F.2d 96, 99 (3d Cir.1983) (citation omitted). However, "in applying the rule, focusing exclusively on its 'particularity' language is 'too narrow an ap-

---

**28.** Judge Neagle cited a definition of willful or wanton misconduct from *Egan v. Erie R.R. Co.*, 29 N.J. 243, 254–55; 148 A.2d 830, 836 (1959): "To establish a willful or wanton injury it is necessary to show that one with knowledge of existing conditions, and conscious from such knowledge that injury will likely or probably result from his conduct, and with reckless indifference to the consequences, consciously and intentionally does some wrongful act or omits to discharge some duty which produces the injurious result."
We believe a reasonable trier of fact could well find that, if the facts are as the plaintiffs allege, plaintiffs have suffered such an injury at the hands of PECO.

proach and fails to take account of the general simplicity and flexibility contemplated by the rules." *Id.* at 99–100, *quoting* 5 Wright & Miller, *Federal Practice and Procedure*, § 1298 at 407 (1969)."

PECO alleges that the Atlantic City Electric/Delmarva Power complaint deficiently pleads fraud. We agree. While Rule 9(b) does not require allegations of date, place, and time but allows plaintiffs "to use alternative means of injecting precision and some measure of substantiation into their allegations of fraud," *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir.1984), *cert. denied*, 469 U.S. 1211, 105 S.Ct. 1179, 84 L.Ed.2d 327 (1985), these plaintiffs have simply not used such means to inject specificity into their allegations of fraud. The Atlantic City Electric/Delmarva Power complaint does allege that one specific INPO letter, which criticized conditions and performance at Peach Bottom, was not disclosed by PECO to the co-owners until two years after it was written. ACE/DPL Complaint ¶ 24.

Unfortunately, the rest of the complaint which deals with fraud (which we consider as encompassing fraudulent nondisclosures, which are undoubtedly harder to plead with particularity) are couched in sweeping and wholly uncabined terms. For example, ¶ 23 of the complaint states that PECO "covered up the magnitude of the problems and the seriousness of the warnings [about safety and management problems at Peach Bottom], and it wilfully and negligently misrepresented to plaintiffs that it had made and was making significant improvements in safety conditions at Peach Bottom." The occasions on which such misrepresentations were made, their substance, and their source are never identified. Moreover, reliance and resulting damages are pled in the most conclusory of sentences. *Id.* ¶ 27. ("Plaintiffs relied to their detriment on the misrepresentations and omissions of Philadelphia Electric."); ¶ 56 (PECO's "misrepresentations proximately caused the damages to Atlantic City and Delmarva ...").

How plaintiffs relied on these misrepresentations and nondisclosures and how their reliance caused millions of dollars of damages in the form of lost profits, increased maintenance costs, and other assorted items is never detailed. Though the Third Circuit has read Rule 9(b) quite liberally, this complaint is still inadequate. Plaintiffs are directed to amend their complaint to add particularized allegations with respect to the nature of PECO's misrepresentations and nondisclosures, the dates on which such statements were made, their source, what reliance they induced on plaintiffs' part, and how the reliance resulted in the damages the plaintiffs seek. The plaintiffs have four weeks to comply with this order, or their fraud count will be dismissed.

PECO also attacks PSE & G's fraud claims on the same ground. And though PSE & G's complaint comes much closer to satisfying the requirements of Rule 9(b), there is still merit to PECO's motion. Paragraphs 16 to 20 of PSE & G's complaint allege that the management of PECO had received reports about operators sleeping on duty in December 1986, but that at meetings in November and December of 1986 PECO did not identify such behavior as a problem despite the fact that it was presenting to the owners a plan designed to deal with problems at the plant. Indeed, on January 9, 1987, PECO is alleged to have written to PSE & G that "[t]here were no major problems and concerns requiring executive level attention" at the plant. PSE & G Complaint ¶ 20.

On the other hand, its complaint also broadly indicates that as early as 1985 PECO had received warnings that performance at Peach Bottom was not up to industry standards. *Id.* ¶ 16. Despite this:

PECO represented to PSE & G through its agents, servants and employees authorized to make such representations, during co-owners meetings and telephone conference calls, and in documents related to corrective action programs such as the Peach Bottom Improvement Program and Peach Bottom Enhancement Program developed by PECO, that it had

made significant improvements in conditions at Peach Bottom.

This is an extremely broad allegation, related as it is to a time frame from January 1, 1985 to March 31, 1987, the date of the shutdown. Such an allegation, we think falls far short of the requisite particularity needed. What did these misrepresentations specifically consist of? There are undoubtedly many components of running a nuclear plant. When did these misrepresentations occur? weekly? daily? who made them? While PSE & G need not answer all these questions, we do think it ought to detail the nature and dates of these misrepresentations, and we order it to do so.

■ PSE & G also alleges that PECO engaged in fraud in the post-shutdown period. This fraud, PSE & G says, is pled with ample particularity and consisted in PECO's misleading:

the NRC and the co-owners after shutdown by falsely representing that the problem was limited to the plant level and that 'things were going well' even though PECO knew ... that the problems which led to the shutdown could not be remedied without dramatic changes at the highest corporate level and that the restart effort was stalled.

PSE & G Brief in Opposition to Motion for Dismissal, at 31, citing PSE & G Complaint ¶¶ 32–41. Basically, this part of PSE & G's complaint alleges that PECO knew, because of INPO and NRC criticism to this effect, that its top management was a cause of the problems at Peach Bottom and that PECO's restart efforts were not progressing well, and yet told its co-owners that the plant's problems did not flow from deficiencies in PECO's top management and that its restart were moving along with alacrity. PECO complains primarily that these allegations relate to opinions and not facts; though this may be true, there are

circumstances in which statements of opinion may rise to a level akin to fraudulent misrepresentations and we believe these allegations are pled, if not with precision, at least with sufficient particularity.[29]

PECO attacks all of the aforementioned misrepresentation claims since PSE & G supposedly does not plead that these representations were false. This argument is without merit; a fair reading of PSE & G's complaint dictates the conclusion that it alleges that PECO knew it was failing to disclose or misrepresenting the true nature of the problems at Peach Bottom.

■ As to PECO's attack on the sufficiency of PSE & G's pleading of reliance and damages, this is more weighty. PSE & G pleads these elements, but cursorily. PSE & G Complaint ¶¶ 45, 55, 59, 60, 65. In its brief it details its theory, which is that if PECO had not misrepresented the problems at Peach Bottom prior to the shutdown, then PSE & G would have acted to remedy those problems and therefore the plant would not have been shutdown. The theory as to the harm caused by the post-shutdown misrepresentations is similar, *i.e.*, that PSE & G would have acted to speed up the restart efforts if it had known the true facts. Given the magnitude of the damages allegedly flowing from PECO's supposed fraud, the complaint is surprisingly devoid of this theory of how the damages flow from such conduct. PSE & G should remedy this deficiency in particularity, by amending its complaint within four weeks, or its fraud claims will be dismissed.

In sum, we grant PECO's motion based on the failure of plaintiffs to plead fraud with particularity. The plaintiffs are urged to set forth their fraud allegations with as much clarity and definition as is practicable. As we have noted, the fraud claims presented here are somewhat unusual. It may be that the basic nature of

**29.** The Restatement (Second) of Torts permits a recovery for harm caused by reliance on the opinions of others in certain circumstances. *See* §§ 525, 538A, 539, 542, 543. No doubt a day will come when we will confront the question of whether these allegations were actionable. PECO, however, has not presented an attack on these allegations supported by legal authority. We expect that it will raise arguments about the opinion-based nature of these allegations and the reasonableness of plaintiffs' reliance upon PECO's word, expressed through its top management, that said top management was not the source of Peach Bottom's problems.

these claims—which is that PECO, over a lengthy period of time, led its co-owners to believe that everything was rosy (or at least ready to bloom again) when the owners were actually heading down the primrose path, not to Longwood Gardens, but to severe economic loss—is such that it makes them difficult to plead with particularity without adding greatly to the length of the complaint. Still, it should be possible to put some walls around these allegations of fraud, so that PECO, and this court, can be reasonably sure of what is contained therein.

## VI. MOTION TO DISMISS PECO'S COUNTERCLAIMS

The last thing on our plate today is a motion by PSE & G to dismiss the counterclaims asserted against it by PECO. These counter-claims arise out of the parties' joint ownership of the Salem nuclear plant in Salem, New Jersey. The parties own and operate the plant under an agreement "substantially similar" to the Peach Bottom Owners Agreement, PSE & G Brief in Support of Motion to Dismiss at 2, except that PSE & G is the licensed operator.

The counter-claims are styled as "contingent;" that is, they are contingent upon PSE & G's view of the contract being accepted in this litigation. PECO vehemently insists that the two Owners Agreements are not breached by mere negligence or mismanagement; however, if it is wrong in this belief, PECO says it is entitled to contract damages because of several power outages and NRC fines assessed because of problems at the Salem nuclear power plant.

PSE & G seeks to dismiss these counterclaims for, among other reasons: (1) their inconsistency with the position PECO is taking with respect to the Peach Bottom Owners Agreement; (2) their inconsistency with PECO's contentions in other fora that these outages and fines were not the result of improper performance by PSE & G; and (3) PECO's failure to allege mismanagement or other impropriety on PSE & G's part which breaches the Salem Owners' Agreement.

We need not tarry over the first of PSE & G's contentions. Federal Rule of Civil Procedure 8(e)(2) expressly permits inconsistent pleadings, moreover, these are, PECO admits, "contingent" claims designed to preserve its rights in case its view of the contractual obligations of the parties is incorrect. We find no basis to dismiss those counter-claims on this ground.

The second ground for dismissal is more weighty and troubling. PSE & G has provided the court with parts of briefs, testimony, and other submissions by PECO to the Pennsylvania Public Utility Commission and various courts in which PECO strenuously argues that the outages which form the basis of their counter-claims were not the result of PSE & G's impropriety.

For example, PECO's first counter-claim is based upon a shutdown at Salem's Unit 1 from February to May 1983. This shutdown, as far as we can tell from the parties' submissions, resulted from two failures of reactor trip circuit breakers in the plant, as well as discovery of shellfish in a water-supplied heat exchanger. Before the Public Utility Commission, PECO argued that the failure of the breakers was caused "by a series of errors made by the plant's manufacturer, Westinghouse Electric Corporation. In contrast, PSE & G actions were at all times reasonable and prudent." PSE & G's Exhibit 2 at 28. Moreover, PECO contended that the extension of the outage in order to investigate and remedy the shellfish situation was not a result of imprudence by PSE & G. *Id.* at 1.

Further, as mentioned earlier, PSE & G, PECO, Atlantic City Electric and Delmarva Power joined together to sue Westinghouse because of the breaker failures. In that litigation, Westinghouse counter-claimed that any loss suffered because of the outage was due to PSE & G's negligence and malfeasance. The co-owners, including PECO, answered by denying this allegation, and PECO filed no cross-claim against PSE & G. PSE & G's Exhibit 8. This litigation against Westinghouse was settled.

PSE & G contends that these counter-claims should be dismissed on grounds of judicial estoppel. We do not doubt that there may be validity to this argument, and that there might be other grounds, based on New Jersey's entire controversy doctrine or on other principles of preclusion, for estopping PECO from bringing any counter-claim based on a shutdown which was the subject of the Westinghouse litigation.

The prior proceedings which PSE & G points to have, however, not been placed in any sort of context. We have very little understanding of their scope or indeed their purpose or nature. Given this record and the fact that we are faced with an attack on the pleadings, we will not discuss the applicability of these doctrines at this time. If and when we must deal with these counter-claims, we will be anxious to fully address these arguments, which, based on what we have read, seem substantial.

■■■ PSE & G's final argument is that PECO's counter-claim has not met the pleading requirements of the Federal Rules of Civil Procedure. In a breach of contract action, the plaintiff, or counter-claimant, satisfies its pleading requirements if it alleges a (1) contract; (2) a breach of that contract; (3) damages flowing therefrom; and (4) that plaintiff performed its own contractual duties. 5 Wright & Miller, *Federal Practice and Procedure*, § 1235 at 189–90. PSE & G claims that PECO has not plead breach, but rather has merely said that certain power outages at Salem and certain fines imposed upon PSE & G, of which PECO paid 42.59%, were the result of conduct by PSE & G which would, if PSE & G's view of the contract is correct, constitute a breach of contract. PSE & G notes, correctly, that the complaint does not specifically allege that it mismanaged the Salem plant. Rather, the complaints set forth simply the circumstances leading to the power outages and fines, but do not allege that PSE & G's mismanagement resulted in those circumstances.

PECO retorts by indicating that it has alleged a contract, and appended a copy to its complaint, and has specifically set forth those provisions of the contract which it alleges PSE & G has violated. Moreover, it has pled resulting damages under each counter-claim, and averred that PECO lived up to its contractual obligations. As to breach, PECO claims that it has pled that the events it complains of were the results of PSE & G's mismanagement. And read liberally, this is so. For example, PECO's fourth, fifth, and sixth counter-claims do state that the NRC imposed penalties on PSE & G because PSE & G violated NRC regulations. PECO's Counterclaim ¶¶ 79, 83, 87. With respect to counterclaims one, two and three, however, one has to strain harder to read the complaint as alleging mismanagement. While each clearly states the basic events leading to the power outages, (*see e.g.*, Counterclaim ¶ 76 "From October 1984 through April 1985, there was a forced outage at Salem Unit 2 which resulted from an electrical failure caused by defects in the generator or by improperly performed repairs...."), and resulting damages, no clear allegations of mismanagement by PSE & G are contained therein.

PECO says that its view of both the Salem and Peach Bottom Owners' Agreements is that:

> an operator of a jointly-owned station is not responsible for the costs incurred by any other co-owner as a result of a forced shutdown or any outage at the station[s]. Nor is an operator responsible under these agreements for station-related costs of a co-owner that are disallowed by a rate-making authority or otherwise not included in the co-owner's rate base because said costs are not deemed to have been prudently incurred.

Counterclaim ¶ 54.

■■■ PECO acknowledges that its contingent counterclaims seek to recoup just such costs. But PECO insists that its breach of contract claims do not rest on a strict liability theory, but on PSE & G's mismanagement theory. PECO's Brief in Opposition to Motion to Dismiss at 10. Given that this is so, and that it has said it will produce evidence of such mismanage-

ment,[30] and that its pleading references PSE & G's contract theory, we will read PECO's complaint as alleging that PSE & G was at the very least negligent in managing Salem with respect to the events giving rise to the counterclaims. Read this way, PECO's complaint is sufficient.[31] Thus, we will deny this motion to dismiss without prejudice.

■ Before parting, however, we will adopt PSE & G's suggestion that we order these contingent counterclaims to be tried separately. These counterclaims are expressly contingent upon the plaintiffs' success in this action. As such, we need not waste the litigants' money and effort, nor our own time, dealing with issues of a hypothetical nature. We will stay all discovery and motion practice on these counterclaims until further order. Insofar as discovery relevant to the counterclaims is also relevant to the plaintiffs claims, it, of course, may proceed. In addition, if any further "contingent" claims are pled, by either PECO or PSE & G, we will also stay discovery and motion practice as to them until further order.

One final word. The court is not happy with the veiled threats to file other claims contained in the submissions of PSE & G and PECO with respect to this motion. We will not allow this litigation to be cluttered by baseless claims. At some point, PSE & G and PECO, respectively, will have to make some strategic choices with respect to their theories of this case. The court well understands the sort of resentment this sort of internecine litigation engenders. This being acknowledged, the court reminds the parties of their duties to the law and this court; Fed.R.Civ.P. 11, though with counsel of this high calibre we realize this is superfluous.

## VII. CONCLUSION

In summary, we have denied PECO's motion to dismiss the plaintiffs' tort claims; we have granted PECO's motion to dismiss plaintiffs' fraud claims for failure to meet the pleading requirements of Federal Rule of Civil Procedure 9(b), said claims to be dismissed unless plaintiffs amend their pleadings in accordance with this opinion within four weeks; and, finally, we have denied PSE & G's motion to dissmiss PECO's counterclaims against it, but we have stayed action on the counterclaims until further order of the court.

---

30. PECO's exhibit A is a copy of NRC documents relating to the breaker failure at Salem. These documents, which include a notice of violation which resulted in an $850,000 fine of PSE & G, contain NRC criticisms of PSE & G's management of Salem.

31. This motion has introduced another interesting feature to this litigation. In response to this motion, PECO has produced a letter by PSE & G's General Counsel, R. Edwin Selover, in which he indicates that the operators of Peach Bottom and Salem (PECO and PSE & G, respectively) are not, under the Owners' Agreement, responsible for any losses or costs incurred by the co-owners because of an operator's "negligence *or even gross negligence* ... or by the vagaries of NRC or other regulatory bodies." PECO's Exhibit B. (emphasis added).

In its reply brief PSE & G now adopts as its position the notion that merely negligent conduct would not breach the Owners' Agreement. This, as we read it, is perhaps a change from its complaint against PECO, and certainly differs from Atlantic City Electric and Delmarva's complaint.

PSE & G says, now, that it did not ground its tort or contract claims in negligence, but on willful and wanton misconduct; and that PECO has, at most, alleged mere mismanagement and therefore dismissal of its contract claim is mandated. Given that there are at least two parties pressing the view that mere negligent performance of contractual duties violates the Peach Bottom Owners' Agreement, we see no basis to dismiss a contingent claim based on this theory. This is especially so where the contingent claim is asserted against a party whose own complaint explicitly pleads a gross negligence claim. *See* PSE & G Complaint ¶ 51.